ROBERTS, J.,
for the Court:
¶ 1. This case centers on Richard and Jane Norman’s adoption of Kate Johnson and Nicole Little.[1] At the time of adoption, Kate was seven-years old. Kate’s biological parents are Bill and Amy Johnson. Nicole was three years old. Nicole’s biological mother is Marie Little.[2] Amy and Marie’s parents, Dave and Tabitha Little (the Littles), and Marie appeal pro se. Bill and Amy have not filed a brief. They are not parties to this appeal. Dave, Tabitha, and Marie raise no specific issues, but we interpret their argument to be that the Franklin County Chancery Court erred when it granted the Normans’ petition to adopt Kate and Nicole. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. The Littles had three children: Amy, Marie, and Mike. Amy and Marie *384 each had daughters. Amy’s daughter, Kate, was born in March 2004.[3] Marie’s daughter, Nicole, was born in 2007.
¶ 3. The record reveals ongoing issues with substance abuse in the Littles’ home in Roxie, Mississippi. Tabitha was arrested for driving under the influence (DUI) during 2004. Amy’s daughter, Kate, was born with marijuana and opiates in her system. During August 2005, the Littles were arrested for growing marijuana at their home.[4] A drug test revealed that Amy also tested positive for marijuana. The Franklin County Department of Human Services (DHS) helped Amy enter a treatment facility, but Amy quit the program. Tabitha picked up Amy after Amy quit the program. Amy later moved to Louisiana so she could work part-time in a bar and live with a man whom she was dating. Amy left Kate, who was one year old at the time, with the Littles. The Littles later obtained custody of Kate after Bill and Amy failed to appear at a hearing on the Littles’ petition for custody. During 2007, Marie gave birth to Nicole. Marie and Nicole lived with the Littles or they lived with Tabitha’s mother, who lived immediately next door to the Littles.
¶ 4. A significant portion of the Little family’s substance abuse was related to prescription medication. Tabitha obtained numerous prescriptions that she related to a back injury. Tabitha had prescriptions for approximately 150 tablets per month of the pain reliever Opana. Within a two-year period, Tabitha also received prescriptions for other pain relievers, muscle relaxers, anti-depressants, and anti-anxiety medications.[5]
¶ 5. Amy moved back into the Littles’ home during 2007. After Amy moved back to the Littles’ home, she and Bill began dating. Bill eventually moved into the Littles’ home. After Bill and Amy got married, they continued to live with the Littles.
¶ 6. It was not uncommon for people in the Littles’ home to lose consciousness because of drug use. Shortly after Nicole was born, Marie lost consciousness because she ingested morphine. There was evidence that Tabitha, Amy, Bill, and Marie had all “passed out” multiple times because of their intake of Tabitha’s prescription medication. Amy, Bill, and Marie also bought pills from other people. Tabitha occasionally gave some of her pain medication to Bill, while Amy and Marie stole pain medication from Tabitha. Amy testified that she stole approximately forty of Tabitha’s Opana pills each month. Marie also stole some of Tabitha’s Opana pills each month. Dave and Tabitha made Bill and Amy move out after Bill was caught rummaging through Tabitha’s purse.
¶ 7. On May 2, 2010, the Littles’ twenty-year-old son, Mike, was pronounced dead. He was found unresponsive in the Littles’ home. Dave told Percy Peeler, the Franklin County Coroner, that Mike had taken Opana the night before he was found dead. Mike’s pockets also contained tablets that *385 were consistent with the description of Xa-nax tablets. Mike’s death certificate indicates that the cause of his death was an accidental drug overdose. However, Tabitha adamantly refused to believe that Mike died from an accidental drug overdose, and the Littles declined to have an autopsy of Mike’s body.
¶ 8. Having personally witnessed Tabitha in an impaired state numerous times, the Normans filed a petition to have Tabitha involuntarily committed. Tabitha was ordered to receive outpatient counseling with Rose Marie Newsom, a certified clinical addiction professional. Tabitha was impaired during her first two sessions with Newsom. After a few sessions with New-som, Tabitha failed to report to any further appointments. On July 1, 2010, the Normans filed a petition for custody of Kate.
¶ 9. DHS made an unannounced visit to the Littles’ home on July 16, 2010. Dave admitted he had been smoking marijuana. A drug test revealed that Dave also had Xanax in his system. Tabitha tested positive for her prescription medications, but three observers opined that Tabitha had taken more than the recommended dosages because Tabitha was impaired. Marie claimed that she could not urinate for a drug test. After drinking a substantial volume of water, she maintained that she could not urinate even after more than an hour. Marie also refused to provide hair for a hair-follicle drug test.
¶ 10. As a result, DHS removed Kate and Nicole from the Littles’ home. Because the Normans had become certified foster parents, the Normans took custody of Kate and Nicole. Edwin L. Bean Jr. was appointed as the guardian ad litem for Kate and Nicole.
¶ 11. On March 1, 2011, the Normans filed an amended petition to terminate Bill and Amy’s parental rights to Kate and Marie’s parental rights to Nicole. The Normans also sought to adopt Kate and Nicole. The chancellor heard the Normans’ petition on August 2-3, 2011. Ultimately, the chancellor terminated Bill and Amy’s parental rights to Kate and Marie’s parental rights to Nicole. The chancellor also granted the Normans’ request to adopt Kate and Nicole. Dave, Tabitha, and Marie appeal.
STANDARD OF REVIEW
¶ 12. The standard of review in this appeal is as follows:
In cases where parental rights have been terminated, our scope of review is limited. We review the chancellor’s factual findings under the manifest error/substantial credible evidence test. This Court will not overturn a chancellor’s findings of fact when supported by substantial evidence unless an erroneous legal standard is applied or is manifestly wrong. Under this standard, the court asks not how we would have decided the case ab initio but whether there [is] credible proof to support the chancellor’s findings of fact by clear and convincing evidence.
In re Adoption of M.C., 92 So.3d 1283, 1286-87 (¶ 18) (Miss.Ct.App.2012) (citations and quotations omitted).
ANALYSIS
¶ 13. Bill and Amy filed a notice of appeal, but they never filed a brief. They are not parties to this appeal. The only brief before us is Dave, Tabitha, and Marie’s six-page, pro se brief.
¶ 14. Essentially, Dave, Tabitha, and Marie seem to claim that the Franklin County judicial system treated them unfairly. They also claim that their attorney “failed [them] completely.” To the extent that Dave, Tabitha, and Marie claim that *386 the chancellor erred when he granted the Normans’ petition, Dave, Tabitha, and Marie cite no authority to support that claim. The failure to cite authority in support of arguments operates as a procedural bar on appeal. M.R.A.P. 28(a)(6). Parties on appeal have a duty “to provide authority in support of an assignment of error.” Davis-Everett v. Dale, 926 So.2d 279, 281 (¶ 5) (Miss.Ct.App.2006) (citation omitted). “Failure to provide authority for an assignment of error operates as a procedural bar, and this Court will consider those unsupported issues to be abandoned.” Id. at 281-82 (¶ 5). We have held that we “will not discard a meritorious complaint simply because it is inartfully drafted.” Id. at 281 (¶ 5) (citation omitted). But we have also held that “[p]ro se parties should be held to the same rules of procedure and substantive law as represented parties.” Id. (citation omitted). Procedural bar notwithstanding, we would still find that there is sufficient evidence to support the chancellor’s decision.
¶ 15. The determination of whether one should be allowed to adopt of a child is a two-step process. In re M.C., 92 So.3d at 1287 (¶ 21). First, a chancellor must “find that one of the grounds for adoption is present: desertion or abandonment, or moral unfitness.” Id. at 1287-88 (¶ 21) (citing Natural Mother v. Paternal Aunt, 583 So.2d 614, 618 (Miss.1991)). The Normans bore the burden of proving the first ground by clear and convincing evidence. Natural Mother, 583 So.2d at 619-20. Second, the chancellor must definitively adjudicate that the proposed adoption promotes or enhances the child’s best interest. In re M.C., 92 So.3d at 1288 (¶ 21) (citing Ainsworth v. Natural Father, 414 So.2d 417, 420-21 (Miss.1982)). We will address each child separately.
I. KATE
THE LITTLES
¶ 16. As previously mentioned, Kate’s parents are Bill and Amy. Bill and Amy have not filed a brief, and they are not parties to this appeal. Dave and Tabitha received custody of Kate during September 2006. Mississippi Code Annotated section 93 — 17—5(l)(ii) (Rev.2004) provides that certain people “shall be made parties to [an adoption] proceeding[,]” including “[a]ny person to whom custody of such child may have been awarded by a court of competent jurisdiction of the State of Mississippi.” Even so, the Mississippi Supreme Court has held that although a grandfather who was the legal custodian of a child was a necessary party to an adoption, his status did not provide him with “the prerogative of consenting to the adoption and by corollary, withholding consent and thereby thwarting the adoption.” Martin v. Putnam, 427 So.2d 1373, 1376 (Miss.1983).[6] And because the Littles had no parental rights to Kate or Nicole, it follows that the Littles have no standing to *387 appeal the chancellor’s decision to terminate Bill and Amy’s parental rights to Kate or Marie’s parental rights to Nicole. However, the Littles have had a substantial impact on the other parties involved in this case.
¶ 17. The Littles both have criminal records that are indicative of their history with drugs and alcohol. Dave testified that he had been to an unspecified program related to his consumption of alcohol. But the record does not specify exactly when Dave went through that program. On October 6, 2004, Tabitha pled guilty to DUI, first offense. Her blood-alcohol content was .225%. On August 11, 2005, DHS received a report related to Amy after the Littles were arrested for growing marijuana at their home. On August 25, 2005, Tabitha was convicted of possession of drug paraphernalia. Dave pled guilty to manufacturing marijuana on April 25, 2006. He was sentenced to five years of probation. According to Dave, he never stopped smoking marijuana during his probation, but he somehow avoided testing positive for marijuana when he was tested by his probation officer. And on January 29, 2009, Tabitha was arrested for “DUI other,” meaning that she had been driving while impaired by some substance other than alcohol. The disposition of that charge is unclear.
¶ 18. The Littles obtained custody of Kate during 2006. They retained custody of Kate until DHS removed her from their home during July 2010. During September 2009, Jane persuaded Tabitha that Kate needed significant restorative dental care. Kate required antibiotics because of infections related to her dental health. It took multiple appointments to repair Kate’s teeth. The Normans paid for Kate’s appointments. During one of Kate’s 9:30 a.m. appointments, Tabitha lost consciousness at the dentist’s office. Despite shouting and shaking Tabitha, it took Amy approximately fifteen to twenty minutes to get a response from Tabitha.
¶ 19. The Littles’ twenty-year-old son, Mike, was pronounced dead on May 2, 2010. Peeler, the Franklin County Coroner, testified that the cause of Mike’s death was an accidental overdose. Dave told Peeler that Mike had taken Opana the night before Mike was found dead. According to Peeler, he recalled that Mike had died after taking medicine that belonged to an unspecified family member. The Littles did not want an autopsy to be performed on Mike’s body. And Tabitha adamantly refused to believe that Mike had died from an accidental drug overdose. The Littles asked Peeler to change the cause of Mike’s death.
¶20. Not long after Mike died, DHS received a report that all of the adults in the Littles’ home appeared to be high during the weekend that Mike had died. DHS arranged an evaluation of Tabitha by Newsom. Newsom concluded that Tabitha was addicted to her medication. Meanwhile, the Normans filed an involuntary commitment petition to address Tabitha’s prescription-drug abuse. Jane testified that she was concerned that Tabitha would overdose. On May 13, 2010, DHS presented Newsom’s report during Tabitha’s commitment hearing. A DHS report indicates that Tabitha “was adjudicated to be a drug abuser and ordered to comply with [New-som’s] counseling.”
¶ 21. On May 18, 2010, Newsom saw the Littles family as part of the court-ordered counseling schedule and treatment plan. According to Newsom, Tabitha’s illness was “most apparent.” Newsom explained that Tabitha’s speech was slurred, and that she would “go off on tangents.” During Tabitha’s second appointment with Newsom, Tabitha was “extremely impaired.” Tabitha had trouble navigating *388 stairs, she “nodded off’ during their session, and her speech was slurred. New-som had to ask Tabitha not to take any medication prior to future appointments. Newsom’s last appointment with Tabitha was during June 2010. And Tabitha failed to appear for her appointment with New-som on August 20, 2010. According to Tabitha, she stopped going to her appointments with Newsom because Newsom was not helping her.
¶ 22. On July 16, 2010, DHS made its unannounced visit to the Littles’ home. Dave tested positive for marijuana and Xanax, which Dave had obtained from Tabitha. Having recently had back surgery, Tabitha tested positive for her prescription medication. However, three observers opined that Tabitha had taken more than her recommended dosage because Tabitha was lethargic and her speech was “somewhat incoherent.”
¶ 23. During August 2010, Robert Pee-ples, the Meadville Chief of Police, twice responded to reports that Tabitha and Marie were causing a disturbance at a pharmacy. Chief Peeples discovered that Tabitha and Marie were causing the disturbance because Tabitha wanted the pharmacy to fill one of Tabitha’s prescriptions. According to Chief Peeples, Tabitha’s speech was slurred, and her facial expression “was dropped.” Chief Peeples opined that Tabitha was “heavily medicated.”
¶ 24. That same month, DHS tried to convince the Littles to enter service agreements related to regaining custody of Kate. According to DHS, the Littles were “uncooperative,” and they “expressed [no] interest” in the service agreements. Approximately a week later, DHS took draft service agreements to the Littles. They still refused to sign them. In September 2010, DHS reported that the Littles had “shown no progress in understanding — or wanting to understand — how their behavior could seriously harm their grandchildren.”
¶25. Tabitha refused to believe that she was addicted to her medications. She testified that she had never been an addict. Newsom explained that Tabitha’s “addictive disease had escalated to such a high point that it was hard for [Tabitha] to accept that she was an addict.” According to Newsom, Tabitha needed “long-term” inpatient treatment, followed by “aftercare” treatment. Unfortunately, based on the contents of Dave, Tabitha, and Marie’s brief, Tabitha interprets the events that led to Kate’s and Nicole’s adoption as the product of (1) the Normans’ opportunistic timing, (2) the failure of the Littles’ attorney, and (8) the failure of the Franklin County judicial system. Cognizant of the sensitive nature of these proceedings and the circumstances that surround them, we disagree with Tabitha’s interpretation.
¶ 26. The chancellor found that the Lit-tles were “part of ... a permissive environment about everything.” The chancellor elaborated that Tabitha had failed to discipline Amy and Marie, and Mike had died due in part to taking Tabitha’s prescription medication. Tabitha picked up Amy when Amy quit her rehabilitation program with just three days remaining. Tabitha testified that she had seen her children lose consciousness. However, Tabitha attempted to deflect her responsibility by testifying that she thought “alcohol was involved.” Although Marie testified that she lost consciousness in 2007 because she had taken morphine orally, Tabitha testified that Marie merely had an allergic reaction to prescription medication.
¶ 27. Furthermore, Tabitha’s intake of prescription medication negatively impacted the people closest to her. Dave tested positive for medicine that had been *389 prescribed to Tabitha. Whether intentionally or negligently, Tabitha had provided Amy, Marie, and Bill with a significant amount of the drugs that they had been abusing. The chancellor noted that Tabitha had enough medication each month to provide approximately fifty Opana pills to Amy, Bill, and Marie — either by giving pills away or allowing them to be stolen. And Tabitha adamantly refused to believe that Mike died of an accidental overdose, despite having no other explanation for Mike’s death. We do not interpret the chancellor as having concluded that Tabitha caused Mike’s death, or having weighed Mike’s death against Tabitha in and of itself. Rather, we interpret the chancellor as having found that Tabitha was clearly in adamant denial of her own addiction and her effect on the people closest to her. We find that there was substantial evidence to support the chancellor’s decision.
BILL AND AMY
¶ 28. As previously mentioned, Bill and Amy are Kate’s biological parents. Although Bill and Amy are not parties to this appeal, we address their part in Kate’s life to highlight the propriety of the chancellor’s decision. Amy was twenty-eight years old at the time of the hearing on the Normans’ petition to adopt Kate. Bill was thirty-one years old. Amy testified that she and Bill had been involved in an “off- and-on” relationship for approximately twelve years, during which they had “always” used drugs together. As of the hearing on the Normans’ petition to adopt Kate and Nicole, Bill and Amy had been married for approximately four years.
¶ 29. Amy dropped out of school when she was in the tenth grade, and Bill dropped out when he was in the eleventh grade. Later, they both obtained General Equivalency Degrees (GEDs). At the time of the trial, Amy had completed three years of community college, although she had not attended classes since 2009. According to Amy, she had to stop taking classes “[bjecause [she] got back on drugs real bad and [she] could not do it.” Amy testified that she had to take another year of classes before she could receive her associate’s degree.
¶ 30. Despite her doctor’s warning, Amy smoked marijuana throughout her entire pregnancy. When Kate was born during March 2004, Kate had marijuana and opiates in her system. Bill and Amy were not together when Kate was born. Bill did not visit Amy or Kate in the hospital because he was on house arrest related to an auto-burglary conviction. According to Bill, he committed auto burglary because he needed money for drugs. Bill’s house arrest was later revoked because he drank alcohol while he was on house arrest. Amy and Kate lived with the Littles after Kate was born.
¶ 31. During August 2005, DHS received a report that Amy had tested positive for marijuana. It was around that time that the Littles had been arrested for growing marijuana at their home. As a result, DHS helped Amy get admitted to Fairchild Treatment Center in Clarksdale, Mississippi. The program was scheduled to last twenty-five days. Amy quit the program after twenty-two days. According to Amy, she “hated [the program] ... because they were telling [her] that [she] was always going to be an addict, and [she] would never be able to get over it, and [she] didn’t believe that.” Tabitha drove to Clarksdale and picked up Amy. Two days later, Amy used crystal meth.
¶ 32. Later that year, Amy moved to Louisiana, where she worked part-time in *390 a bar[7] and lived with a man that she was dating. Amy left Kate with the Littles. During June 2006, the Littles received temporary custody of Kate. Three months later, the Littles received permanent custody of Kate after Bill and Amy failed to appear at the hearing on the Littles’ petition for custody.
¶33. Amy left Louisiana and moved back in with the Littles during July 2007. Later, Bill also moved in with the Littles. During May 2008, Bill was arrested for petit larceny after he drove away from a gas station without paying for gas that he had pumped. Amy and Bill got married dui'ing August 2008. Amy testified that she and Bill continued to live with the Littles for “a few months.” Amy and Bill moved to Ruth, Mississippi. The Littles still had permanent custody of Kate, so Amy and Bill did not take Kate with them. According to Amy, she and Bill did fewer drugs while they lived in Ruth than they did while they lived with the Littles. At approximately 4:30 p.m. on July 17, 2009, Bill was arrested for public intoxication.[8]
¶ 34. Amy and Bill later moved back into the Littles’ house. Amy testified that she stole approximately forty Opana pills from Tabitha each month. According to Amy, because Tabitha had prescriptions for such a significant number of pills each month, Tabitha did not notice that some of them were missing. Even so, it appears Tabitha noticed that she was missing pills because Tabitha accused people of taking them. But no one ever admitted that they had stolen any of Tabitha’s medication. Tabitha attempted to prevent further theft of her medication by keeping her pills in one or more safes. Despite Tabitha’s precautions, Amy testified, “[W]e found out how to get in them.” Bill testified that Tabitha had given him Opana pills. According to Bill, Tabitha had sometimes put pills directly in his hand, or she had left them on a table for him to pick up later.
¶ 35. As best we can tell, shortly before Mike died on May 2, 2010, Amy and Bill were told to leave the Littles’ home after Bill was caught rummaging through Tabitha’s purse. Bill and Amy moved in a home with one of Amy’s relatives. According to Bill, during that time, he and Amy “both decided that [they] wanted to stop doing drugs[,] and [they] just couldn’t [stop]. [They] just couldn’t get around to doing it.” Partly in retaliation for being told to leave the Littles’ home, Bill and Amy approached Jane and told her that they were concerned for Kate’s and Nicole’s safety due to Marie’s and Tabitha’s abuse of prescription drugs. Jane took Bill and Amy to DHS, where Amy and Bill filed a report.[9]
¶ 36. Mike died in Dave and Tabitha’s home sometime between the night of May 1, 2010, and the morning of May 2, 2010. Three days later, Jane went to the home where Bill and Amy were living. Jane took Bill from the home. She took him to live with Juanita Smith, who ran an uncer-tified church ministry that focuses on addiction. Because Bill had taken Xanax *391 and pain medication the previous day, he only vaguely recalled leaving with Jane. Bill continued to live with Smith until February 2011, when he began renting a room from one of his friends.
¶ 37. On July 2, 2010, Amy went to “Jacob’s Well.” [10] She completed the program on December 26, 2010. From there, Amy went to an extension of Jacob’s Well called “Lighthouse.” Amy remained at Lighthouse until April or May 2011. When Amy left Lighthouse, which Bill described as a “half-way” house, Amy moved in with Bill. At the time of trial, Amy and Bill had been renting a home for approximately one month.
¶ 38. Neither Bill nor Amy sought follow-up care after they left the treatment programs. As of the hearing on the Normans’ petition, neither Bill nor Amy had attended any support-group meetings, such as Alcoholics Anonymous or similar programs. According to Amy, regardless of the fact that she had unsuccessfully tried to quit using drugs “five or six times,” she was adamant that she was not an addict. Amy testified that she had recovered from her addiction.[11] Bill also testified that he was not an addict, although he had been an addict before his mother made him go live with Smith. According to Bill, he had “been delivered from addiction.”
¶ 39. Mississippi Code Annotated section 93-17-7(2)(c) (Rev.2004) allows adoption of a child over a parent’s objection when “[t]he parent suffers from ... substance abuse or chemical dependency which makes him [or her] unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.” This Court has upheld a chancellor’s decision to grant a petition for adoption where there was evidence that a father admitted to drug use and tested positive for drugs “throughout his children’s lives and within the time period of [the adoption] proceedings.” In re M.C., 92 So.3d at 1289 (¶ 26).
¶ 40. Amy testified that she had used every drug but heroin. Bill had used cocaine, Percocet, Opana, Xanax, marijuana, and other pain killers. Bill also had a history of alcohol use. His house arrest was revoked because he had been drinking. Bill and Amy both admitted that they suffered from memory loss due to their drug use. They had both lost consciousness at times due to their abuse of medication. Bill testified that there were times when he was afraid for Amy’s life. Amy was not sure how many times she had tried to stop taking drugs, but she estimated that it was five or six times, and she relapsed each time. Bill testified that his and Amy’s drug use was “out of control.” Amy testified that she once “took so many pills [that she] lost a whole weekend.” Specifically, she testified that she “started taking pills on Friday[,] and [she didn’t] remember anything until the middle of the *392 next week.” According to Bill, he and Amy had always used drugs together. And even after Bill went to live with Smith, he somehow managed to take Lor-tab that he had not been prescribed.
¶ 41. Additionally, neither Bill nor Amy considered themselves to be addicts. Newsom, an expert in counseling and addiction, testified that people who had been addicted to using a substance will not necessarily always continue to use that substance, “but ... they will always be predisposed to use [that substance] as a crutch.” It would be reasonable to conclude that Bill’s and Amy’s refusal to accept that possibility makes them more likely to relapse. Bill represented himself, and while he was cross-examining Jim O’Brien, a social worker who had been employed with DHS, Bill asked whether O’Brien thought that Bill had “conquered [his] drug addiction.” O’Brien responded:
[N]o, and the reason I say that, with your language of substance abuse, as a social worker, I ... have ... a sufficient understanding and professional knowledge of substance abuse. It’s not something you have ever[] worked with; you’ve never worked in a treatment facility; and I have participated in a lot of addiction problems by people, and it’s not been in the classroom. But you say, [“] I’m recovered,[”] instead of saying, [“]I am recovering.[”] ... [I]t’s a lifelong process.... [I]t is something that you need to get real about.
¶42. There was substantial evidence that Bill and Amy suffered from chemical dependency. There was also substantial evidence that their chemical dependency made them unable to provide an adequate permanent home for Kate at the time of the hearing or in the reasonably near future. And the chancellor’s decision was supported by both expert opinion and Bill’s and Amy’s established pattern of behavior.
¶ 43. Furthermore, Mississippi Code Annotated section 93-17-7(2)(b) allows the adoption of a child over the objection of a parent when “[t]he parent has not consistently offered to provide reasonably necessary food, clothing, appropriate shelter and treatment for the child.” Amy admitted that she had never bought any food or clothes for Kate. Bill paid monthly child support between the time he began working during February 2011 and the time of the hearing on August 2, 2011. But the chancellor could reasonably find that the brief period that Bill paid child support did not qualify as consistent provision of the necessities addressed in section 93-17-7(2)(b). Moreover, Bill and Amy had never provided consistent individual care of Kate. There is no indication that Bill was involved in Kate’s life for years after Kate was born. And when Kate was one year old, Amy moved and left Kate with the Littles. One year later, the Littles obtained custody of Kate after Bill and Amy failed to appear at a hearing on Dave and Tabitha’s petition for custody. Amy had no plan to obtain custody of Kate. Despite the guardian ad litem’s request for a plan, Amy never provided one because she “got busy.” The Normans were the catalyst that led to Kate receiving significant restorative dental care. And the Normans paid for Kate’s treatments. It was reasonable for the chancellor to describe Bill and Amy as “occasional visitors in Kate’s life.” There was substantial evidence for the chancellor to conclude that it was in Kate’s best interest to grant the Normans’ petition to adopt her. Consequently, we find the chancellor did not err when he terminated Bill and Amy’s parental rights and allowed the Normans to adopt Kate.
II. NICOLE
¶ 44. Marie is Nicole’s biological mother. Nicole’s biological father is unknown. *393 Marie was twenty-four years old at the time of the trial. She dropped out of high school in the ninth grade, but she later obtained a GED. She testified that she had enrolled in community college, but she had not begun taking classes. As best we can determine from the record, for her entire life, Marie lived with either the Littles or her grandmother, who lived directly next door to the Littles.[12] According to Dave, while Marie and Nicole were living with him and Tabitha, Marie would occasionally leave for days at a time with no explanation regarding where she had been.
¶ 45. Marie’s employment history is very limited. During 2008, she worked at a gas station for thirty days, and she testified that she “sat with a lady” for “[t]wo and a half years.” Marie admitted that she had never been able to provide for Nicole’s financial needs, and Dave testified that Marie had never provided a “clean, loving, and drug[-]free home” for Nicole. According to Marie, she had applied for a job at a convenience store, a grocery store, and Walmart, but she had not attempted to find a job through other resources, such as one of the Mississippi Department of Employment Security’s WIN Job Centers or classified ads in the newspaper.
¶ 46. Marie has an extensive history of drug involvement. She testified that she had tried “every drug but heroin.” Amy testified that she had seen Marie “crush pills and snort them.” Amy also had seen Marie lose consciousness because of drugs — “usually at night.” Dave also saw Marie lose consciousness, but he assumed that she did so because of alcohol. Bill testified that Marie’s life was “out of control” because of drugs. And Jane testified that more often than not, she had seen Marie while Marie was impaired.
¶ 47. On January 24, 2005, Marie was found guilty of possession of marijuana. Two months after Nicole was born, Marie lost consciousness after she ingested morphine. She had to be rushed to an emergency room and then transferred to a hospital in Jackson, Mississippi. The record contains a copy of a clipping from the January 21, 2010 issue of “The Daily Leader,” a newspaper that covers Brookhaven, Mississippi, and other areas in southwest Mississippi. According to that clipping, Marie had recently been arrested for driving under the influence. The record does not indicate the resolution of that charge.
¶ 48. During DHS’s unannounced July 2010 visit, Marie told a social worker that she could not urinate for a drug test, despite the fact that Marie drank “an extensive amount of water” during the visit and DHS waited for more than an hour. Marie also refused to provide hair for a hair-follicle test. Nicole was subsequently placed in DHS custody.
¶ 49. Marie was scheduled to provide hair for a hair-follicle test on August 11, 2010, but she did not appear for the test. The next month, Marie was charged with DUI. On November 2, 2010, Marie failed a drug test. She claimed that her positive test resulted from prescribed medication, but she never provided documentation to corroborate her claim. Marie subsequently entered a service agreement with DHS.
¶ 50. As part of her service agreement, on December 28, 2010, Marie began treatment with Newhaven Recovery Center in *394 Brookhaven.[13] Marie remained in treatment through February 12, 2011. As an additional part of her service agreement, Marie was to “become active in After Care Services that include individual and group counseling and random drug screening.” Marie did not comply with that portion of her service agreement.
¶ 51. DHS helped Marie participate in “Born Free,” a program administered by Catholic Charities in Jackson, Mississippi.[14] Marie and Nicole arrived at Born Free on Tuesday, March 8, 2011. Three days later, Marie quit, despite being warned that her decision could result in the termination of her parental rights. Additionally, Marie left without Nicole, and Marie did not inform Nicole that she was leaving. Nicole first discovered that Marie had left without her when the Normans arrived to pick up Nicole. Afterward, DHS requested that Marie enter a subsequent service agreement or write her own plan regarding her intent to regain custody of Nicole. Marie refused.
¶ 52. During the first day of trial, Marie appeared to be impaired. The record indicates that her speech was slurred, and she had trouble understanding and answering questions. But Marie testified that she had not taken any medication. Marie agreed to take a drug test. The drug test revealed that Marie had barbitu-ates in her system.[15] Marie claimed she had been prescribed that medication, but she could not provide any documentation to corroborate her claim. And Marie testified that she could not remember the physician’s name who had prescribed the barbituates. When confronted with her earlier testimony that she had not taken any medication, Marie said that she “didn’t think of those.”
¶ 53. As stated above, section 93-17-7(2)(c) allows the adoption of a child over a parent’s objection when “[t]he parent suffers from ... substance abuse or chemical dependency which makes him [or her] unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.” This Court has upheld a chancellor’s decision to grant a petition for adoption where there was evidence that a parent admitted to drug use and tested positive for drugs “throughout [the] children’s lives and within the time period of [the adoption] proceedings.” In re M.C., 92 So.3d at 1289 (¶ 26). There was substantial evidence that Marie suffered from substance abuse and chemical dependency. Marie’s history of substance abuse speaks for itself. New-som, an expert witness on addiction and counseling, testified that Marie was “definitely an addict.” Bean, the guardian ad litem, testified that Marie was “in denial.” And it was reasonable for the guardian ad litem to conclude that “from day one[, Marie] has been defiant.” Newsom opined that Marie needed inpatient treatment and follow-up care. The guardian ad litem testified that he had “firm convictions that Marie’s parental rights should be terminated.” Leigh Kirkland, a social worker employed by DHS, testified regarding the basis of DHS’s recommendation to termi *395 nate Marie’s parental rights. Kirkland testified:
[F]irst, [Marie] did not complete the service agreement; she did not maintain a stable environment; and she was repeatedly asked to contact the [a]gency. She was instructed by the [c]ourt to participate in a treatment center after she completed New Haven [sic]. She did not comply with that. She was admitted [to Born Free] on March 8, 2011, and [she] left on March 11, 20[1]1.... I actually turned to [Marie] in [c]ourt last year and explained how important it was to follow through with treatment and complete it, and I remember saying, [“T]his is most probably your last chance. If you don’t do this, and [you] leave [Born Free], it will be hard [for you] to get [Nicole] back.[”]
¶ 54. Additionally, there was substantial evidence that Marie’s substance abuse made her unable to provide an adequate permanent home for Nicole at the time of the hearing or in the reasonably near future. Marie had custody of Nicole from the time that Nicole was born until DHS removed Nicole from Dave, Tabitha, and Marie’s home. But Marie never had to care for Nicole on an ongoing, consistent basis without assistance from her parents. Dave testified that Marie had never provided a “clean, loving, and drug[-]free home” for Nicole. Marie occasionally lost consciousness due to her substance abuse. Dave testified that Marie would sometimes leave for days at a time with no explanation as to where she had been. Marie had no home of her own. She testified that she was moving out of her parents’ house, and moving into her grandmother’s house. But Marie’s grandmother’s house was next door to her parents’ house. Thus, Marie would not have placed any distance between herself and what the chancellor characterized as the “permissive drug culture” that existed at her parents’ house. Marie conceded that she was not able to provide for Nicole financially.
¶ 55. There was substantial evidence to support the chancellor’s decision to terminate Marie’s parental rights. Marie was provided with numerous opportunities to address her substance-abuse problem. She chose not to seek follow-up care after she left Newhaven. She failed or refused to take multiple drug tests. She chose to leave Born Free just three days after she arrived. She chose to leave Nicole behind. And although she testified that she had not taken any medication, she was under the influence of barbituates during the first day of the hearing. There was substantial evidence to support the chancellor’s decision that it was in Nicole’s best interest to grant the Normans’ petition to adopt her. We find no merit to Marie’s claim that the chancellor erred when he terminated her parental rights and allowed the Normans to adopt Nicole.
¶ 56. THE JUDGMENT OF THE FRANKLIN COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. IRVING, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. JAMES, J„ DISSENTS WITHOUT SEPARATE WRITTEN OPINION.

. Based on the sensitive and confidential nature of these proceedings, we have substituted fictitious names for all parties.

. The identity of Nicole’s father is unknown.

. Bill is Kate’s father. Bill is also related to the appellees in that he is Jane’s son and Richard’s stepson. Amy and Bill were not in a relationship when Kate was born, but they eventually married during August 2008.

. Dave later pled guilty to manufacturing marijuana. He was sentenced to five years of probation.

.Based on documentary evidence and Tabitha’s testimony, during the two years prior to trial, she had received prescriptions for Opa-na, oxycodone, hydrocodone, Flexeril, tizani-dine, Remeron, Zoloft, Valium, Klonopin, and Xanax. She did not take all of those medications at the same time. For example, when she began taking Klonopin, she stopped taking Xanax. And she stopped taking Opana when she began taking oxycodone.

. The supreme court went on to hold:
What purpose did the legislature intend by designating parties to an adoption proceeding whose consent was not necessary to its validity? We are of the opinion the legislature’s intention was to bring into the suit those persons most likely to be familiar with the background and needs of the person sought to be adopted so they could give testimony concerning his or her best interest.... This of course, accords with our many decisions concerning children wherein we have stated that the best interest of the child is paramount. The designated parties thus become witnesses concerning the facts known to them to aid the trial court in its solemn determination of whether to grant or deny an adoption. We think the testimony from those who are close kin to a child is most significant because, in theory, they love the child best and would give truthful testimony as to the child's best and enduring interest.
Martin, 427 So.2d at 1376-77.

.According to Amy, her part-time work in a bar was the only job that she had ever had, aside from her participation in a work-study program while she was enrolled at Pearl River Community College. Amy testified that she had applied for jobs at local retail businesses, but she had not pursued other employment resources, such as the WIN Job Center.

. Bill’s first public-intoxication conviction was on May 30, 2001. During July 2001, Bill was convicted of possession of marijuana.

. According to Jim O’Brien, a DHS social worker, DHS received a report regarding drug abuse in Dave and Tabitha’s home shortly after Mike died. The record does not corroborate the testimony that Amy and Bill filed a report shortly before Mike died.

. The record contains a copy of a pamphlet from Jacob's Well. The pamphlet describes the facility as an “inter-denominational, six-month, resident, Bible[-]based, worship and work[-]recovery program.” Jacob’s Well claims that it “treat[s] addiction NOT as addiction but as SIN." Furthermore, Jacob’s Well's stated philosophy is that “men and women can be completely healed of and set free from destructive behaviors such as alco-hoi, drug, sexual, pomo-graphic[,] and gambling addictions

. Amy consistently bristled when she was challenged with the “once-an-addict-always-an-addict” philosophy. Years earlier, she had left the Fairchild Treatment Center because she disagreed that she would always be an addict. And she declined to attend any more of Tabitha's meetings with Newsom after Newsom said Amy was a "certified addict.”

. The record indicates that during a July 2010 shelter hearing before the Franklin County Youth Court, Marie said she was moving out of her parents' home and moving into a house with a married couple. It is unclear whether she actually did so. When Marie testified during the hearing on the Normans' petition to adopt Kate and Nicole, Marie said she was living with her parents.

. Newhaven Recovery Center is a division of the Southwest Mississippi Mental Health Complex. However, according to Newsom, Newhaven did not offer the level of treatment that Marie required.

. Arcine Ellison, an employee of Born Free, testified that "Born Free is a residential treatment center for pregnant women or women with small children under the age of five."

.Newsom testified that "[a] barbituate is a psychotropic drag” that "causes mental changes.”