# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00914-COA

**HEATHER KRESSE ROGERS**                                    **APPELLANT**

**v.**

**CHAD KRESSE**                                              **APPELLEE**

DATE OF JUDGMENT:           07/06/2021
TRIAL JUDGE:                HON. D. NEIL HARRIS SR.
COURT FROM WHICH APPEALED:  JACKSON COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:    MATTHEW STEPHEN LOTT
                            WILLIAM BRYAN BEDWELL
ATTORNEY FOR APPELLEE:      CALVIN D. TAYLOR
NATURE OF THE CASE:         CIVIL - CUSTODY
DISPOSITION:                AFFIRMED - 06/13/2023
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.    On July 6, 2021, the Jackson County Chancery Court entered a "Final Judgment Terminating Parental Rights of Heather Marie Kresse." The court found that Heather had "abandoned and deserted her parental role for her minor children" as defined in Mississippi Code Annotated section 93-15-103 (Rev. 2021) and therefore her parental rights should be terminated pursuant to Mississippi Code Annotated section 93-15-119 (Rev. 2021). Heather appealed.

## FACTS AND PROCEDURAL HISTORY

¶2.    Chad and Heather were married on June 28, 2005. The parties had two children: ECK

(born in 2005) and CLK (born in 2012).[1] Chad filed a complaint for divorce on March 26, 2014, in Jackson County, Mississippi. Ultimately, the parties agreed to a divorce on the ground of irreconcilable differences. A "Judgment of Divorce and Incorporated Agreed Property Settlement Agreement" was entered on August 15, 2014. Pursuant to the judgment of divorce, the parties agreed to share joint legal and physical custody of their minor children. Chad's residence would be considered the children's primary residence as long as he continued living within the children's current school district. The parties alternated weekly periods of custody beginning and ending at 6:00 p.m. on Friday.

¶3. On October 21, 2014, Chad filed a "Complaint for Citation of Contempt and Modification." Chad requested a modification of custody. He alleged that Heather had been arrested for shoplifting and had a pending warrant for her arrest. Chad further alleged that Heather had created an unstable and immoral home environment for the children. As a result of Chad's pleading, an order appointing Anna Sukmann as a guardian ad litem (GAL) was entered on February 3, 2015.

¶4. On February 13, 2015, Chad filed a "Complaint for Emergency Custody." Chad claimed that "[Heather] is living in an environment that is unsafe for the minor children[;] specifically, [Chad] found a pill in the school backpack of the minor child, [ECK]. Said pill is believed to be acetaminophen and oxycodone hydrocoloride 325mg/10mg." Further, Chad alleged:

[Heather] is living in a three (3) bedroom home with seven (7) individuals.

---

[1] We use initials for the minor children's names throughout this opinion to protect their identities.

> The sleeping arrangements at the home are not in the best interest of the children and should be investigated further by the Guardian Ad Litem. The minor child [ECK] is sharing a bed with a twelve (12) year old girl, which is not his sister and the minor child [CLK], shares a bed with [Heather] and her boyfriend, Nicholas Richards. The grandfather of the children and the grandfather's girlfriend are in the 3rd bedroom.

As a result, a temporary order was entered on February 19, 2015. The temporary order modified the custody provisions in the judgment of divorce and awarded Heather supervised visitation every other Saturday from 9:00 a.m. until 6:00 p.m. The court ordered that Heather's visitation be supervised by Heather's boyfriend's mother; however, Heather's boyfriend could not be present during her periods of visitation.

¶5. On May 18, 2015, the GAL filed a letter that stated in part:

> It is my opinion that Heather needs more time to "rehabilitate" herself before a full trial on the merits should be had in this case. It has only been three (3) months since the last hearing and she admitted at that time that she was using illegal drugs.

> It is my recommendation that, should Heather pass a drug test administered by this Court that she be afforded supervised visitation every other Saturday and Sunday from 9:00 a.m. until 6:00 p.m. with no overnight visitation. . . .

> Should Heather not pass her drug screen, I believe that all visitation should stop until she can prove to this Court that she is drug-free.

¶6. On May 21, 2015, the chancery court entered another order granting Heather visitation as the GAL suggested, consisting of supervised visitation every other Saturday and Sunday from 9:00 a.m. until 6:00 p.m. each day with no overnight visitation. The order also stated that Heather would be subject to random drug screens. The order further provided that the GAL could file a motion for a drug test at her discretion, and Heather should be tested within twenty-four hours of the motion.

¶7.    On June 23, 2015, Chad filed another complaint for a citation of contempt, alleging that the minor children were left alone with Heather and that the children had been in contact with Heather's boyfriend despite the restrictions contained in the most recent order.  On July 25, 2015, the parties executed an agreed judgment that the court entered: Chad would have "paramount physical care, custody[,] and control" of the minor children.  The parties would share joint legal custody.  Heather was awarded visitation with the minor children every other weekend from 6:00 p.m. on Fridays until 6:00 p.m. on Sundays.

¶8.    On October 20, 2016, Chad filed another "Emergency Complaint to Suspend Visitation."  Chad alleged that "[Heather was] living in an environment that [was] unsafe for the minor children, specifically, the minor children [were] being exposed to violence and drug abuse by [Heather] and her significant other."  Chad also claimed that the minor children were scared to go back to Heather's home.  Because of conversations that he had with ECK, Chad was fearful that the children were being verbally abused.  Chad requested that Heather be required to take a ten-panel hair follicle drug screen.  On November 3, 2016, a temporary order was entered wherein Heather was granted supervised visitation every other Saturday from 1:00 p.m. until 6:00 p.m. to be supervised by Joey or Elizabeth Rogers.  Heather was also given the option for a supervised weeknight visitation.  A subsequent order was entered on December 1, 2016.  The order set a trial date for August 24, 2017, continued the visitation arrangement from the previous order, and stated that "if Chad . . . suspect[ed] Heather . . . or any other person in [Heather]'s home of using drugs, he [could], **at his discretion**, stop any and all visitation." (Emphasis added).

4

¶9.     Suspecting that Heather was still using drugs, on August 14, 2017, Chad filed a "Motion for Hair Follicle Drug Screen." Chad alleged that "upon information and belief, [Heather] [was] abusing drugs and [would] knowingly stop using [them] prior to the Court hearing and [would] [use] masking agents to pass urine test[s]." On August 24, 2017, the chancery court entered an order directing Heather to submit to a drug screen on that same day. The result of Heather's August 24, 2017 urine test was negative. On August 25, 2017, an order was entered stating that "an Order for urine testing and hair follicle testing of the mother of the children was ordered. Upon receipt of the hair follicle results, either party may make a motion to put this matter back on the Court's docket." The chancery court subsequently entered an August 29, 2017 order and stated in part:

> [T]his Court previously entered an Order directing . . . Heather . . . to submit to a urine and hair follicle drug screen and also allowed the parties to make a motion to put this matter on the docket following receiving the results of the drug screen. Attached hereto as Exhibit "A" are the results of the drug screen for . . . Heather . . . . **Either party may make a motion and put this matter back on the Court's docket**.

(Emphasis added). Heather's hair follicle screen was positive for amphetamine and methamphetamine. Neither party made any attempt to place the case back on the docket, and an "Order of Dismissal Without Prejudice for Want of Prosecution" was entered on January 25, 2019. The alleged actions or inactions of both Chad and Heather regarding the exercise of visitation and contact with the minor children between the December 1, 2016 order and 2019 is the primary issue on appeal and will be discussed further in the paragraphs below.

¶10.     On January 15, 2020, Heather filed a "Complaint for Visitation and Other Relief." Heather alleged that "[s]he has not been able to visit with her children despite being clean

5

and sober for a long time." Heather claimed that she would "submit to any kind of drug testing to re-establish a relationship with her children."

¶11. On March 2, 2020, Chad filed an answer as well as a "Counter-Complaint for Appointment of a Guardian Ad Litem, Modification and Contempt." Chad alleged that Heather had "failed to provide any support for the minor children and due to the lifestyle that she has lived, by her choice, the children ha[d] no relationship with [her] and it [was] in the children's best interest that [she] not be awarded visitation." Chad requested that a GAL be appointed to conduct a thorough investigation into his allegations. On March 5, 2020, GAL Matthew Pavlov was appointed to investigate the allegations, complete a report, and make recommendations to the court.

¶12. On March 6, 2020, Chad filed a "Complaint for Termination of Parental Rights." Chad alleged that because of her "continued abuse of illegal substances, [Heather] has not had visitation with the minor children in approximately four (4) years." He claimed that "the minor child, ECK, has express[ed] that he does not want any sort of relationship with [Heather] and the minor child CLK does not know [Heather]." On March 6, 2020, the chancery court entered a temporary order which accepted Pavlov's recommendation and ordered that the children should receive counseling to determine whether a bond could be re-established between the children and Heather.

¶13. The trial began on January 19, 2021, and concluded on March 4, 2021. The only witnesses at trial were Chad, Heather, Pavlov, and Heather's therapist Patricia Seymour. On July 6, 2021, the chancery court entered a "Final Judgment Terminating Parental Rights of

6

Heather Marie Kresse." Heather filed a notice of appeal on July 30, 2021.

## STANDARD OF REVIEW

¶14. "In cases where parental rights have been terminated, our scope of review is limited." *Smith v. Doe*, 314 So. 3d 154, 162 (¶26) (Miss. Ct. App. 2021) (citing *Little v. Norman*, 119 So. 3d 382, 385 (¶12) (Miss. Ct. App. 2013)). "In termination-of-parental-rights cases, [an appellate court] examines 'whether credible proof exists to support the chancellor's finding of fact by clear and convincing evidence.'" *Hartley v. Watts*, 255 So. 3d 114, 118 (¶15) (Miss. 2017) (quoting *W.A.S. v. A.L.G.*, 949 So. 2d 31, 34 (¶7) (Miss. 2007) (citing *K.D.F. v. J.L.H.*, 933 So. 2d 971, 975 (¶14) (Miss. 2006))). The "chancellor's findings of fact are viewed under [the] manifest error/substantial credible evidence standard of review." *Id*. This "Court will not substitute its judgment for the chancellor's." *Id*. (internal quotation marks omitted).

## ANALYSIS

¶15. Heather makes several arguments on appeal. She argues that the chancery court erred in finding, based on the totality of the circumstances, that she abandoned her children. First, Heather claims that she affirmatively displayed conduct inconsistent with abandonment pursuant to section 93-15-103. Secondly, Heather argues that the chancery court ignored Chad's alienating conduct which contributed to the erosion of her relationship with her children. Finally, Heather alleges that the trial court erred in failing to recognize that Chad abused the discretion he was given in the December 1, 2016 order by disallowing visitation

7

despite her compliance with the visitation order.[2]

¶16.	In *Troxel v. Granville*, 530 U.S. 57, 65 (2000), "the United States Supreme Court stated that 'the liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.'" *Smith*, 314 So. 3d at 162 (¶27).	However, "[f]undamental as it is, a parent's right is not absolute and must be weighed against a child's right to grow up with the opportunity to become well adjusted." *Id*.

¶17.	Section 93-15-119 states in part:

> A court hearing a petition under this chapter may terminate the parental rights of a parent when, after conducting an evidentiary hearing, the court finds by clear and convincing evidence:
>
> (a)(i)	That the parent has engaged in conduct constituting abandonment or desertion of the child, as defined in Section 93-15-103 . . . and
>
> (ii)	That termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome . . . .

---

[2] In her brief, in the summary of the argument section, Heather alleges that she was not properly served with a summons pursuant to Mississippi Rule of Civil Procedure 81 for the termination hearing; however, this issue was not fully briefed or even mentioned again within her argument.  Further, Heather did not object to service of process in the chancery court.  On the date of the hearing, Heather was represented by counsel, and no objection was made.  Finally, Heather participated in the two-day trial beginning on January 19, 2021, until its completion on March 4, 2021.  Therefore, this argument is without merit.  In a similar case, *M.A.S. v. Lamar County Department of Child Protection Services*, 353 So. 3d 460, 474 (¶35) (Miss. Ct. App. 2021), this Court held "M.A.S. was present at the adjudication hearing on June 26, 2018, with counsel ready to proceed.  There were no objections made by counsel at the time of the adjudication hearing concerning any service-of-process issues, and the hearing was conducted as scheduled.  Therefore, this issue is without merit."

Section 93-15-103(a) defines abandonment as "any conduct by the parent, whether consisting of a single incident or actions over an extended period of time, that evinces a settled purpose to relinquish all parental claims and responsibilities to the child." Section 93-15-103(a)(ii) further states in part that abandonment may be shown "[f]or a child who is three (3) years of age or older on the date that the petition for termination of parental rights was filed, that the parent has deliberately made no contact with the child for at least one (1) year . . . ."

¶18. Our review of the statutory procedure for terminating parental rights in this case is two-fold. *Smith*, 314 So. 3d at 162 (¶29). First, we must review the chancellor's decision that the parent's actions or inactions constituted abandonment. *Id*. "Then, if the chancellor's decision was supported by substantial credible evidence, our analysis shifts to whether the chancellor should have found that reunification was desirable 'toward obtaining a satisfactory permanency outcome.'" *Id*.

**I.     Did the chancery court err in finding that Heather abandoned the minor children, and did Chad's alleged abuse of discretion thwart Heather's attempts at visitation?**

¶19. Seymour was the first witness to testify at trial on January 19, 2021. Seymour testified that in her sessions with Heather, Heather advised her that she texted Chad to ask if she could see the children and Chad responded,"[Y]ou abandoned them for drugs, . . . there is nothing to make up for[.] [T]he kids have a great life with the mom and dad who loves them." Seymour did not testify as to a specific date that the alleged text messages were exchanged, but the text messages were later introduced into evidence at trial and it was revealed that the exchange took place on November 7, 2019. According to Seymour, Heather told her that she

9

"tried and tried" to have visitation with her children; however, Seymour did not provide the court with any proof of Heather's additional attempts for visitation and there were no specific dates mentioned in Seymour's testimony to corroborate Heather's statements.

¶20.    Pavlov testified on both January 19, 2021, and March 4, 2021, in his capacity as the GAL.  According to Pavlov's testimony, the last time that Heather saw her children was at a family funeral in February 2017, over two years before Heather's request for visitation. Pavlov testified that Heather reached out to the children around April 2019 by sending them a birthday invitation for her new baby, and Heather also sent ECK a birthday card in November 2019.  According to Pavlov, Heather did not reach out to the children or send them money or birthday cards between August 2017 and 2019.  More specifically, Pavlov stated:

> [Heather] didn't do anything.  She didn't send presents.  She didn't send cards . . . [u]ntil April 2019 [when] she sen[t] a birthday invitation.  Between basically March of 2017 and April of 2019, she didn't do [any]thing.  She didn't reach out at all and didn't try at all. . . .  She let the defeat get the best of her while she got herself on her feet, and it just took a long time. . . .  How can [Chad] alienate her when [Heather] was not present . . . that two-year period where she just didn't keep in contact[?]

Pavlov recommended the court terminate Heather's parental rights.

¶21.    Heather testified that she tried to call Chad "two or three times" to speak to the children, but he would not let her speak to them.  Heather did not provide any evidence to corroborate her testimony and testified that she did not keep a diary or have any records of her attempts at physical or telephonic contact.  According to Heather, she was able to talk to ECK on the phone for his birthday in November 2017.  When Heather was asked why she

did not place the matter back on the docket sooner to resolve her visitation issues, she claimed that she did not know what it meant to "put the case back on the docket." According to Heather's testimony, she last saw the children at a family funeral in February 2017, and she last exercised visitation with the children in 2016. Heather claimed that she did not attend any of ECK's football games, and she agreed to counsel's statement that "the sum total of efforts that [she] made to visit with [her] children [was] a couple of Facebook messages and maybe a text or two." Heather was questioned at trial about why she did not have visitation with the children after 2016, and she testified, "[Y]es, it is my fault, because I was getting myself together." She also testified that it had been five years since she had seen the children. She claimed that she sent birthday cards and Christmas cards to the children from 2017 until 2020.

¶22. Chad testified that the last time that Heather exercised supervised visitation was in October 2016. According to Chad, this was the only visitation that Heather had after the hearing on October 21, 2016. Chad stated that Heather would often call and cancel her visitation on the day before or the day of visitation. Heather would promise the children that she was coming to take them and would cancel or just not show up. Chad claimed that Heather forgot ECK's birthday in November 2017 and did not call until December 2, 2017. According to Chad, ECK was angry and asked him, "[D]ad, what do I do, do I call her?" Chad testified that he told ECK, "[Y]ou tell me what you want to do." When Heather finally called on December 2, Chad testified, "I explain[ed] to her that she forgot [ECK]'s birthday. . . . She proceed[ed] to argue with me that his birthday is on December 1st. . . . At

11

that point, obviously she's using. I cancelled all visitations from that point. . . ." Chad testified that he took the court order very seriously; specifically, the portion that stated "if Chad . . . suspects Heather . . . or any other person in [Heather's] home of using drugs, he may, **at his discretion**, stop any and all visitation."[3] (Emphasis added). When asked about his obligation to suspend visitation, Chad testified, "Judge Harris told me that if something happens to those kids and she is high, I suspect she is high and I allow the kids to go with her, he was holding me responsible." According to Chad's testimony, Heather called him in March or April 2017 and asked to see the children, but in that same conversation, she admitted that she had been using drugs. Chad told her that she had a long way to go, and that was the end of the conversation. Chad stated that Heather got mad, yelled at him, and "that was that." Chad also testified that Heather called him in mid-November 2017 and asked what she would have to do to be allowed to see the children. According to Chad, he responded, "I told her what I felt like she needed to do to establish sobriety. I told her if she wanted to see the kids, she needed to pass three hair follicle tests on her own. She needed

---

[3] Heather claims on appeal that "it was error for the trial court to award one parent [Chad] untethered, boundless discretion to stop another parent's [Heather] visitation"; however, the December 1, 2016 order granting Chad discretion regarding visitation is not the subject of this appeal. Further, in *Roberts v. Conner*, 332 So. 3d 272, 290 (¶56) (Miss. Ct. App. 2021), this Court noted:

> Chancellors have broad discretion regarding the appropriateness of visitation. *Porter v. Porter*, 766 So. 2d 55, 58 (¶13) (Miss. Ct. App. 2000). . . . ["]Restrictions on visitation can be placed if they are necessary to avoid harm to the child." *Id.* (citation omitted). . . . "The chancery court has the power to restrict visitation in circumstances which present an appreciable danger of hazard cognizable in our law. Restrictions placed on visitation are within the sound discretion of the chancellor." *R.L.N. v. C.P.N.*, 931 So. 2d 620, 626 (¶24) (Miss. Ct. App. 2005) (citation omitted).

to pay me back the money that I was ordered in court and she owed me."[4]  Finally, Chad testified that Heather sent him a message in December 2019 stating that she wanted to rekindle her relationship with the children, and she followed up with her petition for visitation in January 2020.

¶23.    The testimony presented at trial is consistent that Heather last saw her children in 2017 and only exercised one visitation in 2016 after the December 1, 2016 order.  The testimony was also consistent that Heather attempted to contact Chad regarding possible visitation only a handful of times via phone or Facebook messenger.  While Heather contends that Chad thwarted her visitation attempts, Chad testified that he discontinued visitation upon information and belief that Heather was still using drugs.  Pursuant to the final order entered by the chancery court, Chad was obligated to stop visitation if he suspected Heather's drug use continued.  Heather failed to place the matter back on the docket pursuant to the December 2016 order after failing a hair-follicle drug test.  Further, Pavlov testified that he did not feel as though Chad was alienating Heather or hindering her visitation.  Pavlov stated that ECK did not "represent that his daddy was putting poison in his head about his mama." According to Pavlov, "[Heather] was not present for two years."  Heather's lack of visitation was a product of her absence and not Chad's alienation of the children.  Given the testimony

_____

[4] While this Court does not condone Chad's statement that Heather was required to pay his court-ordered attorney's fees before he would allow her visitation, or accept his rationale in justification for that statement, the fact remains that the overwhelming testimony and evidence showed that Heather did not attempt to place the matter back on the docket for a reconsideration of visitation.  Also, throughout 2017, Chad suspected Heather of using drugs, and pursuant to the December 1, 2016 order, he had the authority to suspend visitation on that basis.

13

and evidence presented at trial, the chancellor did not abuse his discretion in finding that Heather abandoned her children pursuant to sections 93-15-103 and 93-15-119.

> **II.     Was reunification between Heather and the minor children desirable toward obtaining a satisfactory permanency outcome?**

¶24.    Because we find no error in the chancellor's finding that Heather abandoned her children pursuant to the statutes, our analysis shifts to the possibility of reunification between Heather and the minor children. CLK was approximately two years old at the time of the parties' divorce and approximately four years old at the time of the December 1, 2016 order. Pavlov testified that CLK had very little or no working memory of her mother, but CLK did know that she existed. CLK called Heather her "old mom." According to Pavlov, CLK had only one memory to share with him about Heather, and that centered around an event where a family dog attacked CLK at Heather's home. As a result of the attack, CLK required approximately ninety-six stitches and a pending surgery. Pavlov described CLK as a "little ray of sunshine. She is a happy, sweet, funny, warm kid." Pavlov testified that he had concerns about disrupting CLK's life and happiness by forcing her to see Heather. He further stated that "these kids have had very consistent good lives for the past several years, and I hate to see that disrupted. . . . I worry about both of their mental health, their psychological well-being and the long term with all of this." Pavlov testified that ECK was placed in therapy with Terry Gates to assist in working through his emotions about potential visitation with Heather and the current court proceedings. Pavlov reported:

> [A]fter multiple sessions, [ECK] is done. He doesn't want to see [Heather]. He wants to be adopted by his stepmama, Sabrina, who he now considers his mother. . . . [H]e talks about all sorts of things about his mom about the drug

14

use and whatnot. But it's mostly about her not showing up. It's about her putting him in a terrible situation and fighting in the household, and all of these bad memories he has. We talked about when [CLK] was attacked by the dog . . . . He is very scared for his sister, too. A lot of what he talks about is his fear for [CLK] having to go through what he went through. He's very protective over her.

Pavlov's recommendation regarding Heather's reunification with her children was summed up in the following testimony:

This is a difficult case, your Honor. I mean, there is no two ways about it. Ms. Heather is doing better. And she's worked hard to do better. . . .

But my job is not to look out for her best interest. My job is to look out for these children's best interest.

And these kids, when I talk to Ms. Gate[s], she believes that forcing reunification with the son at this point and how he feels he gave a good effort would be detrimental to him. . . . He doesn't want his life or his sister's life interrupted. They are doing well. They are happy. They have moved on.

And that's kind of what I came to, is when it comes down to what is best for these kids, and I think permanency and stability is what is best for these kids. I'm concerned about [CLK]. [S]he doesn't remember her mom, and at some point someone is going to have to talk to her about who her real bio mom is, but at this point of her life, Ms. Gate[s] doesn't think she's at an appropriate age and having to face trauma, because I know she still [has] surgeries coming up with the dog attack. . . .

So at this time, I want these kids to be adopted and have stability in their life. That's my general recommendation, though it is a very difficult call.[5]

Pavlov testified again on the second day of trial and discussed at length his concerns regarding attempting reunification between Heather and the children; however, he concluded that "what I think is best for the kids is probably termination."

---

[5] The record reflects that Chad intends to have his wife Sabrina adopt the minor children; however, at the time of the trial, a petition for adoption had not been filed.

15

¶25. The final judgment terminating Heather's parental rights stated in part:

> Based on the evidence and testimony presented in this matter as to Heather's abandonment and desertion regarding the minor children, along with the Guardian ad Litem Report and his testimony, the Court finds clear and convincing evidence exists that Heather abandoned and deserted the minor children as set forth in both statutory and case law; and

> Based on the clear and convincing evidence, Heather abandoned and deserted her parental role for her minor children herein and the law requires Heather's parental rights terminated as this is in the best interest of the minor children.

Given the evidence and testimony presented at trial, we find no error in the chancery court's decision that reunification between Heather and the minor children was not in the children's best interest.

## CONCLUSION

¶26. After reviewing the record, we find no manifest error in the chancellor's finding that there was clear and convincing evidence Heather abandoned her children pursuant to section 93-15-103. Further, we find no error in the chancellor's finding that reunification between Heather and the minor children was not in the children's best interest. Therefore, the chancellor properly held that Heather's parental rights should be terminated pursuant to section 93-15-119.

¶27. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McCARTY AND SMITH, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., NOT PARTICIPATING.**

16