427 So.2d 1373 (1983)
William M. MARTIN & Clarice Martin
v.
Hugh Davis PUTNAM, Jr. & Donna Stokes Putnam.
In the Matter of the ADOPTION OF W.M.H., a Child.
No. 54111.
Supreme Court of Mississippi.
March 9, 1983.
*1374 Martin A. Kilpatrick, Greenville, for appellant.
John H. Cox, III, Greenville, for appellee.
Before PATTERSON, C.J., and ROY NOBLE LEE and PRATHER, JJ.
PATTERSON, Chief Justice, for the Court:
Hugh Davis Putnam, Jr., and Donna Stokes Putnam, his wife, filed a petition for the adoption of W.M.H. in the Chancery Court of Washington County. Joined as respondents were Dr. William M. Martin and his wife, Clarice Martin, as well as Jerry and Debbie Hughes, M.'s natural parents. Dr. Martin is M.'s natural grandfather and Clarice Martin is M.'s step-grandmother, both of whom are also M.'s legal custodians by court decree. The trial court entered an interim decree of adoption and denied an appeal with supersedeas to Dr. Martin and his wife. Subsequently supersedeas was granted by this Court.
On appeal the Martins assert the trial court erred:
1. In failing to give appropriate weight to the presumption that the best interest of the child sought to be adopted would be served by remaining in the custody of the Martins, the natural grandparents;
2. In incorrectly applying the statute which permits no adoption except in the best interest of the child sought to be adopted.
The evidence established Jerry and Debbie Hughes, the natural parents of M., who is approximately two years of age, both suffer from severe mental disorders. During the summer of 1981 Paula Martin Tubertini, daughter of Dr. Martin and sister of Debbie Hughes, was informed by the welfare department that M. was not being properly cared for by his parents. Paula volunteered to take the child into her home. Later because of the parents' mental disorders, and consequent inability to care for the child, Dr. Martin and his wife sought and were granted legal custody of M. on November 6, 1981, nunc pro tunc September 15, 1981. This decree adjudged the natural parents to be unsuitable to rear the child and permanent custody was placed with the Martins who were found to be proper persons for M.'s custody. It was adjudicated that M.'s best interest would be served by the Martins' custody.
A synopsis of the testimony is that Paula placed M. in a day care nursery operated by Mrs. Putnam while she worked during the day. Paula was also employed part-time as a cashier and so M. stayed with Dr. Martin and his wife two or three nights a week. Subsequently Mrs. Putnam volunteered to keep M. at night also. Believing it to be unwise that the child be awakened at 10:30 or 11:00 in the evening and because of the natural parents' attempts to regain his custody it was decided that M. should stay with the Putnams on a full time basis which began July 25 and lasted until December 9, 1981. It need be also stated that Dr. Martin had some apprehension concerning M.'s best interest because of the natural father's violent tendencies and the mother's mental instability. In this circumstance the child was left in the Putnams' care because the natural parents were not acquainted with them and did not know their place of residence.
After gaining M.'s legal custody, Dr. Martin deliberated upon the best course to *1375 pursue for M.'s future best interest. On several occasions he contacted Dr. Morrow and Mrs. Baggett at the Methodist Children's Home in Jackson concerning the possibility of placing the child for adoption. In these discussions he expressed his concern for M. and his desire that he have a permanent family and security. He was adamant in that he did not want M. moved from place to place with many broken relationships. Mrs. Baggett testified:
[W]hen Dr. Martin came for the first time he did not have a predetermined concept when he came in... . He thought we knew something about child care and he wanted to know what we knew because Dr. Morrow had been Director of the Methodist Children's Home for about 30 years, and he asked us questions and he talked with us about trying to make the best plan that he could for M. and he presented it on the basis that he thought that the parents of the child would never be able to parent him and he was concerned that M. have a good home and security and he wanted him to have it and he wanted him to have it before he had a lot of broken experiences and before he had formed a lot of distrust.
She testified further that Dr. Martin only desired that which was best for M. He expressed to her that if he thought he could properly care for the child he would do so. Ultimately Dr. Martin filled out an application for M.'s admission into the Methodist Children's Home because he then thought it would be best for M. to be reared outside the Greenville area.
Debbie and Jerry Hughes were later arrested for strong armed robbery and incarcerated in Louisiana. No longer fearing for M.'s safety, Dr. Martin requested the Putnams to return the child to him but they declined to do so. They stated Dr. Martin had informed them he was considering placing M. in a home outside the area and they desired to adopt M. themselves. The idea of their adopting M. had been earlier discussed and the doctor indicated that it would be a good possibility. However, Dr. Martin testified he made no such promise but merely informed the Putnams they would be considered if the time for an adoption came to pass. He repeated his primary concern was that M. not be reared in the Greenville area because of Jerry and Debbie's temperaments and because of the stigma resulting from M.'s parents' mental deficiencies and their criminal record. He finally regained M.'s custody from the Putnams through a writ of habeas corpus. The child thereafter resided with the Martins until the decree of adoption in this cause. However, this change of custody was superseded by this Court.
In testifying in opposition to the adoption Dr. Martin, now 53 years of age, stated that although he had previously been unable to decide whether to keep M. or place him in a home, that he had determined at the time of trial that he did in fact want to retain his custody as he believed this would be in M.'s best interest.
The Putnams testified M.'s best interest would be promoted if they were permitted to adopt him. The petitioners were in their mid-thirties, had been married for 17 years and had three children of their own. Although acknowledging M.'s latent potential for mental disorders stemming from his parents' conditions, they nevertheless were willing to adopt, love and protect the child. Unquestionably the Putnams are good parents suitable for the child's adoption, acknowledged by Dr. Martin, but with his qualifying belief the Putnams were reacting emotionally rather than intellectually in their desire for the adoption. His thought was that the petitioners, having no experience in rearing a mentally disturbed child, could not fully appreciate the hardships and cost involved in the event it became a reality. He detailed his own difficulties in rearing a mentally disturbed person over a period of years. From this experience he reasoned the child's best interest would be with his natural kindred, who would love and care for him best.
In granting the adoption the chancellor expressed his concern with what he considered Dr. Martin's vacillations regarding M.'s placement stating:

*1376 "This Court has heard considerable testimony in regard to giving the grandparents the custody of this child on November 6, 1981. The thing that makes this case uniquely different is the attitude of these grandparents regarding the placement of this child up for adoption with the Methodist Children's Home. It is difficult for this Court to reconcile the different positions that have been taken as the Respondents in this case. The grandfather, Dr. Martin, changed his mind the day before the beginning of this trial, according to his testimony. His last statement to this Court was he wanted to keep the child and raise the child, yet at the same time he has expressed great concern as to what would happen if the natural father, Jerry Michael Hughes, came back and wanted the child. This Court doesn't really know what Dr. Martin plans to do. The Court does know that Mrs. Martin, the step-grandmother, wants to back Dr. Martin as much as she can. The stability of these decisions and change of these decisions and opinions as to what would be to the best interests of this child, causes this Court considerable concern, great concern. The Court is satisfied that both of the petitioners in this case are good, Christian people. The Court is satisfied that both Respondents in this case are good people. The Court is convinced that both parties love W.M.H. and are willing to do what is in the best interest of this child, but the Court doesn't believe that Dr. Martin, in his vascillating decisions, and the emotional situation that exists in his mind due to his love for his grandchild and his daughter, is truly capable of knowing what he really thinks or believes would be in the best interest of this child."
Adoptions were unknown to the common law and exist solely by statute. Eggleston v. Landrum, 210 Miss. 645, 50 So.2d 364 (1951). We therefore need to determine the parties necessary to an adoption and their status from the legislative enactments. Miss. Code Ann. § 93-17-5 (1972), designates such parties and their categories. It provides in pertinent part:
There shall be made parties to the proceeding by process or by the filing therein of a consent to the adoption proposed in the petition, which consent shall be duly sworn to or acknowledged and executed only by the following persons, ... (1) the parents, or parent, ... or, (2) in the event both parents are dead, then any two (2) adult kin of the child within the third degree computed according to the civil law, ... or, (3) the guardian ad litem of an abandoned child, ... In addition to the above, there shall be made parties to any proceeding to adopt a child, ... the following:

.....
(b) Any person to whom custody of such child may have been awarded by a court of competent jurisdiction of the State of Mississippi. (Emphasis added).
Dr. and Mrs. Martin are the legal custodians of M. and therefore were necessary parties to the suit for adoption, although it need be noted their status was not such as required their consent for the validity of the proceedings. Had their custody arisen through a proceeding for the termination of parental rights, § 93-15-105 to -109 (Supp. 1982), their consent to the adoption would have been required through the provisions of § 93-15-111 (Supp. 1982).
As mentioned, Dr. Martin is the grandfather of M. and his wife is the step-grandmother and both are custodians of the child by court decree. This status as kindred and legal custodians does not, however, vest in them the prerogative of consenting to the adoption and by corollary, withholding consent and thereby thwarting the adoption. Under the circumstances we are of the opinion that, nevertheless, the respondents are certainly more than nominal parties to the petition.
What purpose did the legislature intend by designating parties to an adoption proceeding whose consent was not necessary to its validity? We are of the opinion the legislature's intention was to bring into the suit those persons most likely to be familiar with the background and needs of *1377 the person sought to be adopted so they could give testimony concerning his or her best interest. In Miss. Code Ann. § 93-17-7 (Supp. 1982), we find legislative reference to this best interest, "[F]irst considering the welfare of the child, or children, sought to be adopted", and in Miss. Code Ann. § 93-15-103 (Supp. 1982), similar language, "when adoption is in the best interest of the child, taking into account whether the adoption is needed to secure a stable placement for the child... ." This of course, accords with our many decisions concerning children wherein we have stated that the best interest of the child is paramount. The designated parties thus become witnesses concerning the facts known to them to aid the trial court in its solemn determination of whether to grant or deny an adoption. We think the testimony from those who are close kin to a child is most significant because, in theory, they love the child best and would give truthful testimony as to the child's best and enduring interest.
The appellants contend the trial court failed to give appropriate weight to the presumption that the child's best interest would be served by remaining in the custody of the grandparents and that an incorrect application was given the statute which permits no adoption except in the best interest of the child. We combine the two. The trial court found that both the petitioners and the respondents are good and suitable people for the adoption or for the retention of his custody. The only reason stated in granting the adoption to the Putnams and terminating the custody of the lawful custodians was that the grandfather had vacillated in determining the best course to pursue for M.'s best interest. We think it necessary to place the vacillations, if they be such, in proper perspective for review.
We are mindful, of course, that we do not reverse a chancellor unless his findings are manifestly wrong because they are not supported by the evidence. E.g. Richardson v. Riley, 355 So.2d 667 (Miss. 1978). Presently we are not confronted with an erroneous determination of facts but rather a conclusion arising from facts in the record. Dr. Martin did vacillate in determining the proper course to pursue to promote M.'s best interest. The question then is, as we see it, whether he was prudent in doing so or whether his indecisions, under somewhat exigent circumstances, should be censured to the extent that a child be taken from his nearest kindred and adopted to others.
At the time M. came into Paula's custody due to his natural parents' neglect, the grandfather feared the father, a paranoid schizophrenic, and the mother, a manic depressive, would attempt to regain possession of the child. He was also concerned that such confrontation could erupt into a tragic family scene. Because of this disquietude M. was placed full time with the Putnams and the grandfather sought advice from disinterested but experienced persons for a solution that would be for the child's interest. About or during this time, as we understand the record, the mother and father were arrested and placed under bond for strong armed robbery. With the fear of confrontation gone Dr. Martin and his wife sought and obtained M. back from the Putnams and thereafter protested his adoption as did the natural parents. Although incarcerated the parents protested the adoption and expressed the desire that their child be placed with the mother's sister who resided in North Carolina.
We construe the adoption statutes as conferring a privilege rather than a right of adoption. Eggleston v. Landrum, 210 Miss. 645, 50 So.2d 364 (1951). Although the Putnams are fine upstanding people and, in our opinion would make excellent adoptive parents, it does not follow that they had an absolute unqualified right to adopt M. over the objection of his close natural kindred. Giving consideration to all of these circumstances and the fact that adoptions are final, hardly subject to review on changed circumstances, we are constrained to the opinion that the learned chancellor erred in granting the adoption. We therefore reverse and dismiss the petition for adoption.
*1378 REVERSED. THE PETITION FOR ADOPTION IS DISMISSED.
WALKER and BROOM, P.JJ., ROY NOBLE LEE, BOWLING, HAWKINS, PRATHER and ROBERTSON, JJ., concur.
DAN M. LEE, J., takes no part.