# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-01046-COA

IN RE: THE ADOPTION OF JANE, A MINOR:        **APPELLANT**
HILDA BOUTWELL

**v.**

LEON FAIRCHILD AND JENNIFER        **APPELLEES**
FAIRCHILD

DATE OF JUDGMENT:        09/10/2021
TRIAL JUDGE:        HON. DAVID SHOEMAKE
COURT FROM WHICH APPEALED:        JEFFERSON DAVIS COUNTY CHANCERY
       COURT
ATTORNEY FOR APPELLANT:        SHAKITA LANETTE TAYLOR
ATTORNEY FOR APPELLEES:        S. CHRISTOPHER FARRIS
NATURE OF THE CASE:        CIVIL - DOMESTIC RELATIONS
DISPOSITION:        AFFIRMED - 01/10/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., SMITH AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Mary and John had a child, Jane, who was born in April 2018.[1] Hilda Boutwell is Jane's paternal grandmother. She appeals from the final judgment of the Jefferson Davis County Chancery Court terminating Mary and John's parental rights and allowing the maternal uncle and aunt, Leon Joseph (Jay) and Jennifer Fairchild, to adopt Jane. Boutwell raises three issues on appeal: First, she asserts that pursuant to Mississippi Code Annotated section 93-15-105(1) (Rev. 2018), the Jefferson Davis County Chancery Court did not have

---

[1] To maintain confidentiality, pseudonyms are used for the minor child and her biological parents.

subject matter jurisdiction to terminate Mary and John's parental rights (TPR) because an ongoing proceeding concerning Jane was pending in the Jefferson Davis County Youth Court. Second, Boutwell asserts that at the time of the chancery court adoption trial, Jane was not eligible for adoption because the youth court purportedly had entered a permanency order in which it found that terminating Mary and John's parental rights would not be in Jane's best interest. Lastly, Boutwell asserts that even if the chancery court had jurisdiction over the TPR proceeding, it erred by relying on a guardian ad litem's (GAL) alleged hearsay testimony and reports in terminating Mary and John's parental rights. Finding these assignments of error without merit, we affirm.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     Jane tested positive for "illegal drugs" at birth and was immediately taken into custody by the Mississippi Department of Child Protection Services-Jefferson Davis County (CPS). After her release from a three-week stay in a hospital's infant intensive care unit, Jane was released into Boutwell's care. A disposition hearing took place in the Jefferson Davis County Youth Court on May 15, 2018. Jefferson Davis County does not have a county court. A youth court referee presided over the youth court proceeding.

¶3.     Keleigh Rene Sullivan (the youth court GAL), John Alan Buffington (the prosecuting attorney), CPS, Jane, Mary, and Boutwell attended the disposition hearing. The youth court referee determined that Jane was a "neglected child" pursuant to Mississippi Code Annotated section 43-21-105(l) (Supp. 2017), removed Jane from Mary and John's physical and legal

custody, and placed Jane with Boutwell. The disposition order further provided that on May 15, 2018, CPS had "referred the parent for random drug testing" and "developed a family service plan with the mother [Mary]." Mary was allowed supervised visitation with Jane and was ordered to submit to random drug screens. The youth court referee further ordered "that the child will under no circumstances associate with, be in the presence of, or otherwise communicate with the natural father, [John]."

¶4.     No other pleadings, orders, transcripts, or any other materials from the youth court proceeding are in the record.

¶5.     The Fairchilds (Jane's maternal aunt and uncle) filed a "Petition for Termination of Parental Rights and Adoption" (TPR and adoption petition) in chancery court on September 12, 2018, naming as respondents CPS, Boutwell, Mary, and John. All respondents were served with process, and the summonses and returns are contained in the record. In their petition, the Fairchilds averred that Jane had been in the sole care of Boutwell and them since her birth, the biological parents were "unfit" under Mississippi Code Annotated section 93-15-119(1)(a) (Rev. 2018), and the biological parents had exhibited one or more grounds to terminate their parental rights pursuant to Mississippi Code Annotated section 93-15-121(a) through (e) (Rev. 2018). The Fairchilds further averred that they would be fit and suitable parents for Jane and that a CPS home study had approved them and their home in its entirety.

¶6.     Boutwell filed an "Answer and Counter-Petition for Adoption and Termination of

3

Parental Rights" in chancery court on December 12, 2018. She denied that the chancery court had personal or subject matter jurisdiction of the matter due to the pending youth court proceeding. In her counter-petition, Boutwell alternatively sought to adopt Jane and terminate the biological parents' parental rights should the case be transferred to the chancery court. Boutwell alleged that both biological parents had consented to Boutwell adopting Jane. Boutwell subsequently filed a motion to dismiss the matter based on the chancery court's alleged lack of subject matter jurisdiction due to the pending youth court proceeding. The Fairchilds responded to Boutwell's motion to dismiss.

¶7. On June 6, 2019, the chancery court denied Boutwell's motion to dismiss the Fairchilds' TPR and adoption petition, finding "that according to [section] 9[3]-15-105(1), the Chancery Court has exclusive jurisdiction [over the TPR and adoption matter] when there is no county court serving as a youth court and the motion to dismiss is denied."

¶8. On February 20, 2020, the chancery court held a TPR hearing and entered an order on October 6, 2020, terminating John and Mary's parental rights. The details regarding this hearing and the October 6, 2020 order are addressed below. In a separate order, the chancery court also appointed a chancery court GAL, Tracey Brown Seghini.

¶9. A trial on the contested adoption was held on June 17, 2021. Before the adoption trial started, however, Boutwell's counsel requested that she be allowed to question Seghini about her investigation regarding the termination of the biological parents' rights. The chancery court allowed counsel to do so, and Seghini's original and amended reports (collectively,

report) were admitted into evidence without objection. Seghini testified about the TPR issues and testified at length about the adoption issue. The Fairchilds, Boutwell, and the child's maternal grandmother also testified at trial. The trial proceedings will be discussed below.

¶10.    After the parties rested, the chancellor told the parties that he would take the matter under advisement. The chancery court entered its corrected final judgment on September 10, 2021 (final judgment), setting forth its findings on the TPR and adoption issues. The chancery court determined that "based upon all of the clear and convincing evidence presented in this matter that the best interest and welfare of the minor child . . . was to terminate the parental rights of her parents and to allow the maternal uncle and aunt Leon and Jennifer Fairchild to adopt the child." Further details of the chancery court's final judgment are addressed below.

¶11.    Boutwell appealed.

## STANDARD OF REVIEW

¶12.    "Whether the chancery court had jurisdiction to hear a particular matter is a question of law, to which this Court must apply a de novo standard of review." *In re Adoption of C.C.B. v. G.A.K.*, 306 So. 3d 674, 677 (¶8) (Miss. 2020) (quoting *C.T. v R.D.H.* (*In re Adoption of D.N.T.*), 843 So. 2d 690, 697 (¶12) (Miss. 2003)). Additionally, "'a question of subject matter jurisdiction may be presented at any time'—including during appeal." *In re M.A.S.*, 245 So. 3d 410, 416 (¶23) (Miss. 2018) (quoting *Burnette v. Hartford Underwriters Ins. Co.*, 770 So. 2d 948, 951 (¶7) (Miss. 2000)). "A chancellor's findings of fact will not

5

be disturbed unless manifestly wrong or clearly erroneous." *Sanderson v. Sanderson*, 824 So. 2d 623, 625 (¶8) (Miss. 2002). In particular, in cases such as this one in which the parental rights have been terminated, "our scope of review is limited." *Little v. Norman*, 119 So. 3d 382, 385 (¶12) (Miss. Ct. App. 2013) (quoting *In re Adoption of M.C.*, 92 So. 3d 1283, 1286-87 (¶18) (Miss. Ct. App. 2012)). As such, "[w]e review the chancellor's factual findings under the manifest error/substantial credible evidence test. This Court will not overturn a chancellor's findings of fact when supported by substantial evidence unless an erroneous legal standard is applied or is manifestly wrong." *Id.*

## DISCUSSION

I.  **The Chancery Court's Subject Matter Jurisdiction Over the Fairchilds' Petition for Termination of Parental Rights and Adoption**

¶13. Boutwell asserts that the chancery court did not have subject matter jurisdiction to terminate Mary and John's parental rights because when the Fairchilds filed their TPR and adoption petition in chancery court, there was already an ongoing proceeding in the Jefferson Davis County Youth Court concerning Jane. According to Boutwell, pursuant to section 93-15-105(1), because the youth court already had jurisdiction over Jane in an abuse and neglect proceeding, it had exclusive jurisdiction to terminate parental rights. For the reasons set forth below, we find that this assertion is not persuasive.

¶14. As noted above, Boutwell moved to dismiss the Fairchilds' TPR and adoption petition, asserting that the chancery court "does not have subject matter and personal

6

jurisdiction over the parties or the matter as the case is pending in Youth Court and that Court has exclusive jurisdiction."

¶15.    The Fairchilds responded to Boutwell's motion to dismiss, alleging that they retained new counsel who "made contact with the youth court referee." The youth court referee advised their counsel "that she does not have jurisdiction to hear the TPR and the contested adoption" and instructed him to file a motion in the youth court requesting that it transfer "jurisdiction to Chancery Court to hear the TPR and contested adoption." According to the Fairchilds' response, their counsel filed that motion in youth court.[2] The Fairchilds requested that the "[chancellor] confer with the [y]outh [c]ourt [r]eferee and determine which court should hear the TPR and adoption matter involving [Jane]."

¶16.    The chancery court denied Boutwell's motion to dismiss the Fairchilds' TPR and adoption petition on June 6, 2019, finding "that according to [section] 9[3]-15-105(1), the Chancery Court has exclusive jurisdiction [over the TPR and adoption matter] when there is no county court serving as a youth court and the motion to dismiss is denied." We find no error in the chancery court's ruling.

¶17.    Section 93-15-105(1) sets forth the jurisdiction and venue of termination-of-parental-rights proceedings under the Mississippi Termination of Parental Rights Law (MTPRL), Mississippi Code Annotated sections 93-15-101 through -133 (Rev. 2018). At the time the

---

[2] This motion is not in the record, nor does the record contain any order or any other action taken on a motion to transfer.

Fairchilds filed their TPR and adoption petition in the chancery court and when the chancery court entered its June 6, 2019 order dismissing Boutwell's motion to dismiss for lack of subject matter jurisdiction, section 93-15-105(1) provided:

> The *chancery court has original exclusive jurisdiction over all termination of parental rights proceedings* except that a *county court, when sitting as a youth court with jurisdiction of a child in an abuse or neglect proceeding*, has original exclusive jurisdiction to hear a petition for termination of parental rights against a parent of that child.

Miss. Code Ann. § 93-15-105(1) (Rev. 2018) (emphasis added).

¶18.    Thus, as explained by the Mississippi Supreme Court in *In re Adoption of C.C.B.*, 306 So. 3d at 678 (¶12), "[t]his statute . . . provides that the 'original exclusive jurisdiction' for 'all termination of parental rights proceedings' is chancery court." (Quoting Miss. Code Ann. § 93-15-105(1)). "A *specific situation* is excepted. If a '*county court*, when sitting as a youth court, [has] jurisdiction of a child in an abuse or neglect proceeding,' then that court has 'original exclusive jurisdiction to hear a petition for termination of parental rights against a parent of that child.'" *Id.* (emphasis added).

¶19.    The "specific situation" referenced by the supreme court in *In re Adoption of C.C.B.* does not apply in this case because Jefferson Davis County does not have a county court, and thus it has no "county court . . . sitting as a youth court" as described in the exception to section 93-15-105(1). The different youth court divisions are described in Mississippi Code Annotated section 43-21-107 (Rev. 2015), and these divisions depend on whether a particular

8

county has a county court. *See* Miss. Code Ann. § 43-21-107(1)-(2);[3] *see also K.M.K. v. S.L.M. ex rel. J.H.*, 775 So. 2d 115, 118 n.2 (Miss. 2000); *In re J.T.*, 188 So. 3d 1192, 1203 n.7 (Miss. 2016) (Beam, J., concurring in part and in result). As the supreme court explained in *K.M.K.*, "[o]ne division . . . is the [c]ounty [c]ourt, presided over by the county court judge or a judge chosen by the county court judge, in those counties that have a county court." *K.M.K.*, 775 So. 2d at 118 n.2. In counties in which there is no county court, "[a]nother division is a division of the chancery court, presided over by a chancellor or a youth court referee." *Id.*

¶20. A youth court referee presided over the youth court proceeding in this case. This case does not involve a jurisdictional conflict between a chancery court and a "county court . . . sitting as a youth court," Miss. Code Ann. § 93-15-105(1)—and this is the *only* exception to

---

[3] Section 43-21-107 provides:

> (1) A youth court division is hereby created *as a division of the county court of each county now or hereafter having a county court, and the county judge shall be the judge of the youth court* unless another judge is named by the county judge as provided by this chapter.
>
> (2) A youth court division is hereby created *as a division of the chancery court of each county in which no county court is maintained and any chancellor within a chancery court district shall be the judge of the youth court of that county within such chancery court district* unless another judge is named by the senior chancellor of the county or chancery court district as provided by this chapter.

Miss. Code Ann. § 43-21-107 (emphasis added). Mississippi Code Annotated section 43-21-111(1) (Rev. 2015) provides that "[i]n any county not having a county court or family court the judge may appoint . . . regular or special referees . . . ."

a chancery court's "original exclusive jurisdiction over all termination of parental rights proceedings" addressed by section 93-15-105(1).

¶21. We find that the Legislature clarified this point when it amended section 93-15-105(1) in 2020 by again referring only to "a *county court* sitting as a youth court" (emphasis added), and adding a second reference to "county court" in delineating the exception as follows:

> The chancery court has original exclusive jurisdiction over all termination of parental rights proceedings except when a *county court sitting as a youth court* has acquired jurisdiction of a child in an abuse or neglect proceeding, then the *county court* shall have original exclusive jurisdiction to hear a petition for termination of parental rights against a parent of that child pursuant to the procedures of this chapter.

Miss. Code Ann. § 93-15-105(1) (Rev. 2021) (emphasis added). Though it could have, the Legislature did not incorporate any reference to youth court proceedings in counties without county courts.

¶22. We recognize that in *In re M.A.S.*, the supreme court generally referenced the "youth court" in explaining that under section 93-15-105(1), "if the youth court already has jurisdiction over the child in an abuse and neglect proceeding, then the youth court has exclusive original jurisdiction to hear a petition to terminate parental rights." *In re M.A.S.*, 245 So. 3d at 415 (¶18). But the issue of exclusive jurisdiction in *In re M.A.S.* arose in Harrison County, a county that has a county court in addition to a chancery court. *Id.* at 412 (¶¶5-6). Thus, the statutory language relied upon by the supreme court in section 93-15-105(1), "a *county court*, when sitting as a youth court with jurisdiction of a child in an abuse or neglect proceeding" (emphasis added), plainly applied. That is not the situation in this

10

case because Jefferson Davis County has no county court sitting as a youth court. As such, *In re M.A.S.* is wholly distinguishable.

¶23. Of note is that in *In re M.A.S.*, the supreme court recognized that "[i]n a sense, Section 93-15-105(1) codifies our priority-jurisdiction holding in *K.M.K.*" *Id.* at 417 n.9. In *K.M.K.*, the supreme court held "that a chancery court may not exercise jurisdiction over any abused or neglected child or any proceeding pertaining thereto over which the youth court may exercise jurisdiction if there has been a prior proceeding in the youth court concerning that same child." *Id.* (quoting *K.M.K.*, 775 So. 2d at 118 (¶10)). Relevant to the case at hand, the *K.M.K.* court explicitly limited its ruling, as follows: "We note especially, however, that this holding is *limited* to questions of priority jurisdiction in *counties that have a county court sitting as a youth court* in addition to a chancery court." *K.M.K.*, 775 So. 2d at 118 (¶10) (emphasis added).[4]

¶24. Under the plain language of section 93-15-105(1) that was in effect, the limitation delineated in *K.M.K.* applies here. Because Jefferson Davis County has no "county court sitting as a youth court," we find that the chancery court had "original exclusive jurisdiction" over the Fairchilds' TPR and adoption petition in this case.

---

[4] *See also Neshoba Cnty. Dep't of Hum. Servs. v. Hodge*, 919 So. 2d 1157, 1161 (¶¶16-17) (Miss. Ct. App. 2006) (rejecting contention that the Lauderdale County Chancery Court lacked jurisdiction over a TPR and adoption petition in light of ongoing proceedings in the Neshoba County Youth Court because this situation was "not a conflict between a county court sitting as youth court and a chancery court in the same jurisdiction," and thus "the jurisdiction of the chancery court was proper").

¶25.   In sum, we are bound to apply an unambiguous statute "according to its plain meaning," *Battise v. Aucoin*, 311 So. 3d 588, 591 (¶11) (Miss. 2021), with "the ultimate goal of this Court . . . [being that we] discern and give effect to the legislative intent." *City of Natchez v. Sullivan*, 612 So. 2d 1087, 1089 (Miss. 1992).  Here, both the plain meaning of the statute and the legislative intent support our determination that the chancery court had original and exclusive jurisdiction over the Fairchilds' TPR and adoption petition. Accordingly, we find no error in the chancery court's denying Boutwell's motion to dismiss for lack of subject matter jurisdiction and ruling that it had exclusive jurisdiction of the Fairchilds' TPR and adoption petition.  We find that Boutwell's assertions to the contrary are without merit.

## II.   Jane's Eligibility for Adoption

¶26.   According to the assertions in Boutwell's brief, Jane was not eligible for adoption because the youth court entered a "September 15, 2020 [p]ermanency [o]rder that granted . . . Boutwell physical and legal custody of [Jane] and further ordered that termination of parental rights would not be in the best interest of [Jane]."  As we have addressed above, however, we find that pursuant to section 93-15-105(1), the chancery court properly assumed "original and exclusive jurisdiction" over the termination of Mary and John's parental rights when it entered its June 6, 2019 order denying Boutwell's motion to dismiss the Fairchilds' TPR and adoption petition.

¶27.   But even if Boutwell's contention had merit, she has waived it on appeal.  Boutwell

has "the burden of ensuring the record contains all facts necessary to the determination of the matters appealed. It is well settled that a reviewing court cannot consider matters which do not appear in the record and must limit itself to the facts that do appear in the record." *In re V.R.*, 725 So. 2d 241, 245 (¶16) (Miss. 1998). In particular, Boutwell must "justify [her] arguments of error with a proper record, which does not include mere assertions in [her] brief." *Watson v. State*, 100 So. 3d 1034, 1038 (¶10) (Miss. Ct. App. 2012).

¶28. Boutwell relies solely on the purported entry of a September 15, 2020 permanency order in the youth court proceeding to support her contention that Jane was not eligible for adoption at the time of trial in the chancery court. The permanency order Boutwell relies upon, however, is not in the record. As we have noted, nothing from the youth court proceeding is in the record other than the youth court's May 15, 2018 disposition order.

¶29. We acknowledge that at the adoption trial in chancery court, Boutwell's counsel requested the GAL (Seghini) to read one sentence from the purported permanency order, as follows: "And further, this Court finds the Mississippi Department of Child Protection Services has documented compelling and extraordinary reasons why termination of parental rights would not be in the best interest of [Jane]." But counsel did not have the order admitted into evidence. This Court cannot determine the complete content of the order, the proceedings and circumstances surrounding its issuance, the context in which it was issued, or even whether the purported order was actually entered.

¶30. Indeed, Seghini testified that based on her own review of the youth court file, the last

13

order entered in that proceeding was dated July 17, 2018. The GAL's report and amended report were admitted into evidence at trial and likewise provided that the last order entered in the youth court file was dated July 17, 2018. Seghini also testified that she "completely disagreed" with the statement from the order that she was asked to read aloud, pointing out that "six, eight months before this [permanency] order was entered," the CPS social worker Stephanie Williams testified at the February 20, 2020 chancery court's TPR hearing that termination was absolutely in Jane's best interest.

¶31. We reject this assignment of error for the reasons stated above.

### III. Termination of Parental Rights

¶32. Boutwell asserts that even if the chancery court "did not err in allowing the chancery matter to proceed[,] then [the court] did err when [it] substantially relied on hearsay testimony in the GAL's report to terminate the parental rights of the natural parents." We reject this assignment of error because Boutwell lacks standing to appeal the chancery court's TPR decision. Even if Boutwell had standing, there is no indication in the record that Boutwell made any hearsay objection (or any objection at all) to the testimony or evidence relied upon by the chancery court in terminating John and Mary's parental rights. The issue is therefore waived on appeal. Lastly, even if Boutwell's hearsay objection had been preserved as an issue on appeal, we reject it on the merits. We find that the chancery court's judgment terminating Mary and John's parental rights is supported by substantial evidence, as addressed below.

14

### A. Standing

¶33. Only Boutwell, not Mary or John, has appealed the chancery court's termination of John and Mary's parental rights. The record reflects that Mary and John were served with Mississippi Rule of Civil Procedure 81 summonses when the Fairchilds filed their TPR and adoption petition. Based upon the record before us, there is no indication that Mary or John made any appearance whatsoever in any chancery court proceeding. Regarding the February 20, 2020 TPR hearing, the chancery court's October 6, 2020 order terminating parental rights specifically provides as follows:

> On February 20, 2020, this matter came before the Court upon the petition of Leon Fairchild and Jennifer Fairchild to terminate the parental rights of the natural parents, [Mary and John]. The Court called three times the [natural] parents' names without a response. The Court also noted that both natural parents were personally served a copy of the petitioners' [the Fairchilds'] petition to terminate parental rights. The petitioners also served [CPS with the TPR petition and CPS] filed no answer nor objection . . . . Boutwell[,] the paternal grandmother[,] also stated to the court that she had no objection to the termination of [John's] parental rights.

Likewise, neither John nor Mary was at the June 17, 2021 trial. Their acknowledgments of consent[5] were admitted as exhibits at trial, and the chancery court's September 10, 2021 final

---

[5] Mary and John both signed an "Acknowledgment of Consent" providing that they consented to Boutwell filing a petition for an uncontested adoption of Jane "and intend to join in the filing thereof." Each acknowledgment of consent further provides:

> I understand that this document is being requested as part of the intake process of the Mississippi Volunteer Lawyers Project, only. I further acknowledge that this Acknowledgment of Consent is not legally binding and is not meant to be filed in any court of law or as part of any legal proceedings. I understand that I will be later presented a copy of the Petition that I will read

15

judgment found that both Mary and John "executed consent[s] for [Jane] to be adopted."

¶34.    As for Boutwell, although she was a necessary party to the TPR action, *see* section 93-15-107(1)(c),[6] we find that she does not have standing to appeal the chancery court's decision terminating Mary and John's parental rights.  *Little*, 119 So. 3d at 386-87 (¶16).  The *Little* opinion and *Martin v. Putnam*, 427 So. 2d 1373 (Miss. 1983), support this determination.

¶35.    In *Little*, Richard and Jane Norman sought to adopt Kate[7] when she was seven years old.  *Little*, 119 So. 3d at 383 (¶1).  Kate's  biological parents are Bill and Amy.  *Id.*  Kate's maternal grandparents, Dave and Tabitha Little, received custody of Kate in September 2006, *id.* at 384 (¶3), when Kate was approximately two years old.  *Id.* at 385 (¶10).  Kate was removed from their custody in 2011 and placed in foster care with the Normans.  *Id.* The Normans filed a petition to terminate Bill and Amy's parental rights and also filed a petition to adopt Kate in 2011.  *Id.* at (¶11).  The chancellor terminated Bill and Amy's parental rights and granted the Normans' request to adopt Kate.  *Id.*  The Littles appealed.  *Id.*

¶36.    Bill and Amy (Kate's biological parents) were not parties to the appeal.  This Court

_____

and sign at the appropriate time verifying my joinder in the Petition.

Neither Mary nor John joined in Boutwell's counter-petition for adoption and termination of parental rights.

[6] In relevant part, this section provides that "[n]ecessary parties to a termination of parental rights action shall include . . . any agency, institution or person holding custody of the child."  Miss. Code Ann. § 93-15-107(1)(c) (Rev. 2018).

[7] The adoption of another child was also at issue in *Little*, but we discuss only those facts relevant to the case before us.

held that although the Littles were necessary parties to the adoption proceeding pursuant to section 93-17-5(1)(ii), this did not provide them with standing to appeal Kate's adoption. *Id.* at 386 (¶16). Continuing, the Court further held that "[a]nd because the Littles had no parental rights to Kate, . . . it follows that the Littles have no standing to appeal the chancellor's decision to terminate Bill and Amy's parental rights to Kate[.]" *Id.* at 386-87 (¶16).

¶37. We recognize that the Littles no longer had custody of Kate when they challenged the TPR decision in *Little*. *Id.* at 385 (¶10). In the case before us, Boutwell had custody of Jane. We do not find, however, that this fact is a basis for distinguishing our holding in *Little*. To explain, in deciding *Little*, this Court relied on *Martin*, a case in which "the Mississippi Supreme Court . . . held that although a grandfather *who was the legal custodian of a child* was a necessary party to an adoption, his status did not provide him with 'the prerogative of consenting to the adoption and by corollary, withholding consent and thereby thwarting the adoption.'" *Id.* at 386 (¶16) (emphasis added) (quoting *Martin*, 427 So. 2d at 1376). Likewise, in this case, although Boutwell was Jane's legal custodian and was a necessary party to the TPR action, we find no legal basis for allowing her to "thwart[]" the TPR proceeding, the chancery court's October 6, 2020 TPR order, or the court's September 10, 2021 final judgment on this issue.

¶38. In short, Boutwell has no "parental rights" to Jane and, therefore, "no standing to appeal the chancellor's decision to terminate [Mary and John's] parental rights to [Jane]."

*Id.* at 386-87 (¶16). "A lack of standing robs the court of jurisdiction to hear the case." *Pruitt v. Hancock Med. Ctr.*, 942 So. 2d 797, 801 (¶14) (Miss. 2006). In this case, "[b]ecause [Boutwell] lacks appellate standing, we do not address the merits of this issue." *Patrick v. Boyd*, 198 So. 3d 436, 446 (¶33) (Miss. Ct. App. 2016) (finding that the child's grandmother lacked standing to appeal termination of biological father's child support or chancellor's order changing child's surname and thus declining to address those issues on the merits); *see also, e.g.*, *BancorpSouth Bank v. Bruce Sweet Potato Inc.*, 296 So. 3d 143, 150 (¶26) (Miss. Ct. App. 2020) (recognizing "that a 'plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties'" (quoting *Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984))).

### B.     Waiver

¶39.     In any event, even if Boutwell had standing to pursue this issue, she waived her contention that the chancery court impermissibly relied on "hearsay testimony in [Seghini's] report" to terminate Mary and John's parental rights. Based on the record before us, Boutwell made no objection to *any* testimony or evidence on this issue at either the February 20, 2020 TPR hearing or the June 17, 2021 trial. "As there was no contemporaneous objection to [the GAL's] testimony based on hearsay, the trial court was not afforded an opportunity to rule on specific testimony on the hearsay evidence issue." *McDonald v. McDonald*, 39 So. 3d 868, 884-85 (¶54) (Miss. 2010). "The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision." *Id.*

18

Because Boutwell failed to preserve this issue for appeal, we find that it is procedurally barred. *Id.*; *Williams v. Williams*, 309 So. 3d 560, 567 (¶39) (Miss. Ct. App. 2020), *cert. denied*, 302 So. 3d 643 (Miss. 2020).

### C. The Chancery Court's Termination-of-Parental-Rights Determination

¶40. Lastly, even if Boutwell's hearsay assertions had been preserved, we find that they do not warrant reversal. Specifically, Boutwell asserts that the chancery court impermissibly relied on Seghini's "hearsay testimony" and report in finding that the statutory requirements under section 93-15-119(1) had been met to terminate Mary and John's parental rights. Boutwell supports her argument by citing *Ballard v. Ballard*, 255 So. 3d 126, 136 (¶30) (Miss. 2017), for the proposition that "a chancery court cannot rely on guardian ad litem hearsay that is not within one of the enumerated exceptions as substantive evidence." We find that *Ballard* is distinguishable and that *Stewart v. Stewart*, 309 So. 3d 44 (Miss. Ct. App. 2020), rather than *Ballard*, is instructive here.

¶41. In *Stewart*, the chancery court granted the father's motion to modify a child custody order, awarding him sole physical custody of the children and joint legal custody to both parents. *Id.* at 68 (¶64). Citing the general rule from *Ballard*, the mother asserted that in doing so, the chancery court erred in relying on the GAL's "hearsay" report and testimony. *Id.* at 78 (¶107). This Court rejected her assertion, first pointing out that in *Ballard*, "the chancery court's analysis determining [a mother's] unfitness focused primarily on the guardian ad litem's report and testimony . . . [based on] the guardian ad litem's third-party

19

interviews . . . . None of the persons interviewed by the guardian ad litem [in *Ballard*] testified at trial except the parties and one [other person]." *Id.* at (¶108) (quoting *Ballard*, 255 So. 3d at 132-33 (¶18)).  In contrast, the Court in *Stewart* found that "the chancery court's decision in this case was supported by ample evidence *in addition to the GAL's report and testimony*, and thus, . . . we find [the mother's] inadmissible-hearsay assertions without merit." *Id.* at 79 (¶110) (emphasis added).  The same situation exists here.

¶42.    The record is clear that at the February 20, 2020 TPR hearing, the chancery court heard testimony from Stephanie Williams, the CPS worker involved in taking Jane from Mary and John at Jane's birth and who was also involved in the youth court proceedings concerning Jane.  Williams testified that the natural parents had made no effort to resolve their drug issues nor cooperate with the reunification plan the agency requested they sign.  The agency offered to send both to in-patient drug treatment, and they refused.  The Youth Court Disposition Order was also admitted into evidence.  In that order, the youth court referee determined that Jane was a "neglected child" pursuant to section 43-21-105(l) and removed Jane from Mary and John's physical and legal custody.

¶43.    On June 17, 2021, the chancery court conducted a trial on the contested adoption.  Both Mary and John "executed consent[s] for [Jane] to be adopted."  Before the adoption trial started, Boutwell's counsel also elicited testimony from Seghini about her investigation regarding the termination of the natural parents' rights, and Seghini's original and amended reports were admitted into evidence without objection.

¶44. Regarding the TPR issues, Seghini testified that she reviewed the youth court file and chancery court file, interviewed the parties, and interviewed the CPS worker Williams, who had testified at the February 20, 2020 TPR hearing. Seghini also conducted home visits at the Fairchilds' and Boutwell's homes and observed Jane during these visits. Jane was three years old at the time of trial.

¶45. Based upon her investigation, Seghini testified that she found that neither parent had cooperated with the family plan proposed by CPS, they did not take the required drug tests on time (she believed John never even took a drug test), and Mary failed every drug test she took. Seghini found that the biological parents did not take "any necessary steps to regain custody of their child," and so she believed "that termination of their parental rights was in the best interest of the child based on . . . [the biological parents'] abandoning [their] responsibilities" and their refusal to comply with the CPS plans. Seghini also described her home visits with the Fairchilds and Boutwell, including the overall home environments and her observations of Jane's development and demeanor during the visits. Seghini expressed concern over Boutwell allowing the biological parents to visit Jane (as prohibited by no-contact orders) and found that home environment and socialization considerations were more favorable in the Fairchilds' home.

¶46. Jay and Jennifer Fairchild, Jane's maternal grandmother, and Boutwell also testified at the trial and were subject to cross-examination. Jennifer testified about Mary's continuing drug problems, and copies of texts from Mary regarding selling or buying drugs were

21

admitted into evidence. Through the Fairchilds' testimony, the maternal grandmother's testimony, and Boutwell's testimony, the chancery court also heard that Mary and John did not have custody of other biological children and that they had failed to obey no-contact orders issued by the youth court and the chancery court that prohibited them from contacting Jane.

¶47. In its September 10, 2021 final judgment, the chancery court summarized Seghini's qualifications and her testimony addressing the TPR issues, as well as Williams's testimony from the February 20, 2020 TPR hearing. The chancery court also summarized the testimonies of the other witnesses. After detailing this information, the chancery court ordered the termination of Mary and John's parental rights to Jane, ruling that it had been shown by clear and convincing evidence that the statutory requirements had been met to do so and that termination was in Jane's best interest and welfare.

¶48. The record plainly reflects that in terminating Mary and John's parental rights, the chancery court considered not only Seghini's testimony and report but also the testimony of CPS social worker Williams (who testified and was subject to cross-examination at the February 20, 2020 TPR hearing) and the testimonies of the Fairchilds, the maternal grandmother, and Boutwell, who testified at trial and were subject to cross-examination. The chancellor also reviewed and considered all exhibits entered at trial, including Mary's drug-related text messages and the May 15, 2018 youth court disposition order. Because the chancery court's decision to terminate Mary and John's parental rights was amply supported

22

by testimony and evidence in addition to Seghini's report and testimony, "we find [Boutwell's] inadmissible-hearsay assertions without merit." *Stewart*, 309 So. 3d at 79 (¶110).

¶49. In sum, for all the reasons addressed above, we affirm the chancery court's September 10, 2021 final judgment.

¶50. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**